**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Gabriel GURROLA–GARCIA,**
**Defendant-Appellant.**

**No. 76–2164.**

United States Court of Appeals,
Ninth Circuit.

Dec. 20, 1976.

---

W. Edward Morgan, Tucson, Ariz., for defendant-appellant.

William C. Smitherman, U. S. Atty., Tucson, Ariz., for plaintiff-appellee.

Before HUFSTEDLER and WALLACE, Circuit Judges, and WATERS,* District Judge.

WALLACE, Circuit Judge:

Gurrola-Garcia was convicted of attempting to export ammunition in violation of 22 U.S.C. §§ 401 and 1934 and certain regulations. He contends on appeal that the district court erred in refusing to grant his motion to quash the indictment. That motion was made on the grounds, first, that the indictment failed to charge a crime and second, that 22 U.S.C. § 1934 and regulations promulgated thereunder, specifically 22 C.F.R. § 127.01, are unconstitutional. We affirm.

On January 30, 1976, agents of the U.S. Customs Service observed Gurrola-Garcia enter a store in Nogales, Arizona, and then exit with a large brown bag. While still under observation by the agents, he placed the bag under the hood of his vehicle and then proceeded to the port of entry on the Arizona-Mexico border. Before he could cross the border, however, Gurrola-Garcia was stopped. Agents discovered 2500 rounds of high-caliber ammunition in the concealed bag. The ammunition was of types which required an exportation license issued by the Department of State. When Gurrola-Garcia indicated that he had not applied for and did not intend to apply for such a license, he was arrested.

The indictment returned against Gurrola-Garcia charged him with violating 22 U.S.C. §§ 401 and 1934 and 22 C.F.R. §§ 121, 122, 123 and 127. 22 U.S.C. § 401(a) does no more than authorize federal officials to seize and detain for forfeiture proceedings war materials "[w]henever an attempt is made to export" such materials from the United States in violation of law. It is 22 U.S.C. § 1934 that serves as the basis for Gurrola-Garcia's conviction. It provides in subsection (a) that:

> The President is authorized to control, in furtherance of world peace and the security and foreign policy of the United States, the export and import of arms, ammunition, and implements of war, including technical data relating thereto, other than by a United States Government agency. The President is authorized to designate those articles which shall be considered as arms, ammunition, and implements of war, including technical data relating thereto, for the purposes of this section.

22 C.F.R. § 127.01, one of the regulations promulgated by the President pursuant to 22 U.S.C. § 1934, provides that:

> It shall be unlawful for any person to export or *attempt to export* from the United States any of those articles on the U.S. Munitions List without first having obtained a license therefor, unless written approval was obtained from the Department of State or an exemption from this requirement is authorized by this subchapter.

(Emphasis added.)

I

■ Gurrola-Garcia first contends that section 1934 does not criminalize an "attempt" to export listed munitions; it merely grants to the President authority to "control . . . the export and import of arms, ammunition, and implements of war." This authority to "control" is limited by section 1934 to designating "those articles which shall be considered" munitions for the purposes of the section. The authority

---

* Honorable Laughlin E. Waters, United States District Judge, Central District of California, sitting by designation.

does not include the power to create by regulation the crime of "attempt to export." Thus, he argues, the statute neither makes "attempt to export" a crime nor empowers the President to make it such and, thereto, no crime was charged in the indictment.

Gurrola-Garcia, however, fails to read far enough into the statute. Subsection (c) of section 1934 provides in part that

[a]ny person who willfully violates any provision of this section *or any rule or regulation issued under this section* . . . shall upon conviction be fined not more than $25,000 or imprisoned not more than two years, or both.

(Emphasis added.) Thus, the statute does provide for the issuance of regulations by the President. Although "the regulation calls the statutory penalties into play, the statute [here, section 1934(c)], not the regulation, creates the offense and imposes punishment for its violation." *United States v. Hark*, 320 U.S. 531, 536, 64 S.Ct. 359, 362, 88 L.Ed. 290 (1944).

Nevertheless, if 22 C.F.R. § 127.01 extends or modifies section 1934, it is invalid, *see, e. g., Utah Power & Light Co. v. United States,* 243 U.S. 389, 410, 37 S.Ct. 387, 61 L.Ed. 791 (1917); *Federal Maritime Comm'n v. Anglo-Canadian Shipping Co.,* 335 F.2d 255, 258 (9th Cir. 1964), and Gurrola-Garcia's violation of the regulation could not serve as the basis for his conviction under section 1934(c), *United States v. Silva,* 272 F.Supp. 46, 49 (S.D.Cal.1967). Our review of the language of section 1934(a) and its legislative history convinces us, however, that section 127.01 is fully authorized by section 1934.

At the outset, we reject Gurrola-Garcia's contention that section 1934 authorizes the President to do no more than designate what "shall be considered as arms, ammunition, and implements of war . . . for the purposes" of that section. There are two reasons why the authority to "designate" munitions, given in the second sen-

tence of section 1934, should not be read as constituting an all-encompassing and exclusive definition of the "control" power given in the first sentence. First, such a construction would render the first sentence meaningless surplusage. We interpret the statute so that all its parts have meaning and operative effect. Second, the verb *control* denotes a wide range of activities and action. The word encompasses far more than merely listing types of munitions. We read "control" with its normal and broad meaning, and not in the severely limited manner for which Gurrola-Garcia contends.

Given the wide sweep of the word *control,* section 127.01 of the regulations is well within the grant of authority to the President. An effective means of controlling the exportation of listed munitions is to stop smugglers as they approach an international border, to confiscate their munitions and to impose upon them criminal sanctions for their almost-successful smuggling efforts. Indeed, if section 1934 were read as not permitting the executive to thwart attempts, the entire congressional scheme would be ineffectual. No crime would be committed until the smuggler stepped across the border, but at that point the violator would be outside the jurisdiction of the law enforcement officers and courts directed to penalize him for the crime.

The sparse legislative history on section 414 of the Mutual Security Act of 1954, the section codified as section 1934, also reinforces our view that Congress intended to give the President the authority to prohibit attempts to export. During the second session of the Eighty-third Congress, Representative Morano introduced H.R. 6344, a measure designed to control the exportation and importation of munitions.[1] H.R. 6344 was a lengthy, highly-detailed measure. Section 3(b) of the bill provided:

It shall be unlawful for any person to export or *attempt to export* from the United States any arms, ammunition, or

---

1. H.R. 6344, 83d Cong., 2d Sess. (1954). The text of the bill is set out in *Hearings on H.R. 6344 Before the Ad Hoc Subcomm. of the*

*House Comm. on Foreign Affairs,* 83rd Cong., 2d Sess., at 1–4 (1954).

implements of war designated by the President under the authority of this section without first having obtained a license.

(Emphasis added.) Section 7 constituted a broad delegation of rulemaking authority to the President to effectuate the purposes of the bill.

When Congress drafted the comprehensive Mutual Security Act of 1954, a measure encompassing a wide range of matters involving foreign affairs and national security, it incorporated the essential provisions of H.R. 6344 into section 414. The process of adoption involved distillation and condensation of the Morano bill but not modification of its purposes. The Senate Report called section 414 merely a "condensed version" of H.R. 6344 and went on to assure Congress that the drafting committee "felt that *all the essential provisions* of the previously introduced bills [H.R. 6344] have been retained [in section 414].[2] (Emphasis added.) The House Report contained a similar assurance.[3]

It appears, therefore, that Congress intended no diminution in the scope of section 1934 when it streamlined H.R. 6344. The purposes of the provision were to be accomplished not by a detailed statutory scheme but by a grant of authority to the President to "control" the exportation of listed munitions. One of those congressional purposes, as set forth in the detailed H.R. 6344, was to thwart and to penalize attempts to export listed munitions unlawfully. The President's regulation prohibiting attempts to export, 22 C.F.R. § 127.01, thus falls squarely within Congress' statutory scheme as revealed in the legislative history.

We conclude, therefore, on the basis of the language of the statute and its legislative history that section 1934 fully autho-

rizes 22 C.F.R. § 127.01, specifically that regulation's prohibition of attempts to export listed munitions. Thus, the indictment properly charged a crime.[4]

## II

■ As an alternative argument, Gurrola-Garcia contends that if section 1934 is construed as empowering the President to criminalize "attempt" conduct, the section constitutes an unconstitutional congressional delegation of legislative power to the executive. Although his contention on this point is not entirely clear, he appears to be arguing also that only Congress, and never the President, may create crimes carrying an imprisonment sanction. In his argument, he relies on *National Cable Television Ass'n v. United States,* 415 U.S. 336, 94 S.Ct. 1146, 39 L.Ed.2d 370 (1974), *Schecter Poultry Corp. v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), and *Panama Refining Co. v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

Similar attacks on section 1934 have been made in other courts and have been uniformly rejected. The Eighth Circuit in *United States v. Stone,* 452 F.2d 42 (8th Cir. 1971), and the Fifth Circuit in *Samora v. United States,* 406 F.2d 1095 (5th Cir. 1969), held that the delegation provision of section 1934 were not unconstitutional. In doing so, the courts relied primarily on the President's traditional dominance in and responsibility for foreign affairs. *United States v. Stone, supra,* 452 F.2d at 47; *Samora v. United States, supra,* 406 F.2d at 1098. See also *Zemel v. Rusk,* 381 U.S. 1, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965); *United States v. Curtiss-Wright Export Corp.,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936).

Whatever the motives for the initial creation of the domestic affairs—foreign af-

---

2. S.Rep. No. 1799, 83rd Cong., 2d Sess. 79 (1954), U.S.Code Cong. & Admin.News 1954, p. 3244.

3. H.R.Rep. No. 1925, 83rd Cong., 2d Sess. 89 (1954) ("The section [that became section 414 of the 1954 Act] contains the essential provisions of H.R. 6344 . . . ..").

4. The same issue resolved here was presented to our brothers of the Fifth Circuit in *Samora v. United States,* 406 F.2d 1095 (5th Cir. 1969). In response to an argument similar to that presented to us in this case, they came to the same conclusion we have reached.

fairs distinction in delegation cases,[5] the principle that Congress may delegate broad authority to the President in foreign affairs is clearly controlling law today. *See, e. g., Zemel v. Rusk, supra,* 381 U.S. at 17, 85 S.Ct. 1271 (1965). Applying that principle, we conclude, as have the Fifth and Eighth Circuits, that section 1934 does not constitute an unconstitutional delegation of legislative power to the executive.

■ Our conclusion is not altered by the fact that section 1934 imposes criminal sanctions for violation of regulations promulgated pursuant to the statute. It is well established that Congress may constitutionally provide a criminal sanction for the violation of regulations which it has empowered the President or an agency to promulgate. *E. g., Singer v. United States,* 323 U.S. 338, 65 S.Ct. 282, 89 L.Ed. 285 (1945); *Avent v. United States,* 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202 (1924); *United States v. Grimaud,* 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (1911); *Samora v. United States, supra,* 406 F.2d at 1098 & n. 8; *Heaton v. United States,* 353 F.2d 288 (9th Cir. 1965). *See also* L. Jaffe, Judicial Control of Administrative Action 109–10 (1965); Schwenk, The Administrative Crime, Its Creation and Punishment by Administrative Agencies, 42 Mich.L.Rev. 51, 56–59 (1943).[6]

AFFIRMED.

---

**5.** It has been suggested that the Supreme Court initially created the distinction in *United States v. Curtiss-Wright Export Corp., supra,* 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255, to "get around *Panama* and *Schecter*." *United States v. Butenko,* 494 F.2d 593, 630 (3d Cir. 1974) (Gibbons, J., dissenting); *see also* Lofgren, United States v. Curtiss-Wright Corporation: An Historical Reassessment, 83 Yale L.J. 1 (1973).

**6.** Even if we were to apply Justice Brennan's suggestion that those congressional delegations are invalid which create "the danger of overbroad, unauthorized, and arbitrary application

of criminal sanctions in an area *of protected freedoms*," *United States v. Robel,* 389 U.S. 258, 272, 88 S.Ct. 419, 428, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring) (emphasis added), we would reach the same result. There is no "protected freedom" endangered by section 1934 and its regulations. Certainly the Second Amendment guarantee of "the right of the people to keep and bear Arms," U.S.Const. amend. II, does not protect the efforts of a person to take munitions across an international border and into a foreign country. *Cf. Marchese v. California,* 545 F.2d 645, 647 (9th Cir. 1976).