UNITED STATES of America,
Plaintiff–Appellee,

v.

Eugene You–Tsai HSU, Defendant–
Appellant.

United States of America,
Plaintiff–Appellee,

v.

David Tzuwei Yang, Defendant–
Appellant.

Nos. 02–4859, 02–4860.

United States Court of Appeals,
Fourth Circuit.

Argued: Jan. 23, 2004.

Decided: April 14, 2004.

**ARGUED:** Richard M. Steingard, Los Angeles, California, for Appellant Yang. Richard Henry Gordin, Tighe, Patton, Armstrong, Teasdale, P.L.L.C., Washington, DC, for Appellant Hsu. Kathleen O'Connell Gavin, Assistant United States Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Neal Goldfarb, Tighe, Patton, Armstrong, Teasdale, P.L.L.C., Washington, DC, for Appellant Hsu. Thomas M. DiBiagio, United States Attorney, Baltimore, Maryland, for Appellee.

Before WIDENER, MOTZ, and GREGORY, Circuit Judges.

Affirmed by published opinion. Judge DIANA GRIBBON MOTZ wrote the opinion, in which Judge WIDENER and Judge GREGORY joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

A jury convicted Eugene You–Tsai Hsu and David Tzuwei Yang of violations of the Arms Export Control Act and related offenses. On appeal, Hsu and Yang principally challenge their convictions on the ground that the Arms Export Control Act is unconstitutionally vague as applied to them and that the district court erred in refusing to instruct the jury on entrapment. Finding these and their other contentions to be without merit, we affirm.

### I.

#### A.

The Arms Export Control Act ("AECA"), 22 U.S.C. § 2778 (2000), regulates the export of military products. The AECA authorizes the President to "designate those items which shall be considered as defense articles," and "promulgate regulations for the import and export of such articles . . . ." § 2778(a)(1).

The President has delegated his rule-making authority to the Secretary of State, *see* Exec. Order No. 11,958, 42 Fed. Reg. 4311 (Jan. 24, 1977), who has promulgated the International Traffic in Arms Regulations ("ITAR"), 22 C.F.R. §§ 120.1–130.17 (2003). These regulations contain the United States Munitions List ("Munitions List"), a categorical list of "defense articles" that cannot be exported without first obtaining a license from the Department of State. *See* § 2778(b)(2); 22 C.F.R. §§ 120.6, 121.1, 123.1(a).

Of particular relevance here, the Munitions List includes military encryption devices, 22 C.F.R. § 121.1, Category XIII(b), such as the KIV–7HS ("KIV") encryption unit manufactured by Mykotronx, Inc. Because of the United States' arms embargo with the People's Republic of China, the State Department will not approve a license to export any Munitions List items, including KIV units, to that country. 22 C.F.R. § 126.1(a) (2003).

The AECA imposes both civil and criminal penalties for its violation. § 2778(c), (e). A criminal sanction requires that a person "willfully" violate the statute or its regulations. § 2778(c).

## B.

On May 1, 2001, at the request of a business associate in China, Eugene You–Tsai Hsu telephoned Mykotronx seeking information on the company's KIV encryption device. A Mykotronx employee referred Hsu to "Daniel Stevenson," who was described to Hsu as a sales representative working for "Stellar International," a company purportedly selling Mykotronx products. Unbeknownst to Hsu, "Daniel Stevenson" was in fact Dan Supnick, an undercover agent with the United States Customs Office, and "Stellar International" was an undercover company. It is undisputed that at the time Hsu made this initial call to Mykotronx, he did not know that exporting the encryption device without a license was illegal.

The following day, Hsu spoke with Agent Supnick (hereinafter "Stevenson") and requested information on the KIV unit; Hsu explained that he was planning on exporting it to a customer in China. (Stevenson recorded all of the conversations discussed herein, and the government played those tapes for the jury.) Stevenson immediately informed Hsu that the device was on the Munitions List; that

it required a license for export; that no license would be approved if the end-user was in China; and that export of the device without the required license violated the law. After making these disclosures, Stevenson suggested "off the record," that he would still be willing to "make the sale" and "work with" Hsu if Hsu had "a way to get [the equipment] out" of the country. When Hsu stated that he did not want to do anything illegal, Stevenson responded, then "I don't think it's worth ... send[ing] you any information,'cause it can't go legally to China." Nevertheless, Hsu insisted that Stevenson send him a brochure on the KIV unit, which Stevenson did.

More than two weeks passed without any interim contact between the parties. Hsu then telephoned Stevenson to discuss further the purchase and export of the encryption device. This phone call marked the beginning of a negotiation process spanning roughly the next three months. During this time, Stevenson repeatedly told Hsu that shipment of the KIV encryption device without a license violated the law and clarified that the shipment would still be illegal even if the devices were sent to Singapore or another country if the end-user remained in China. Hsu never stated that he did not want to go forward with the transaction.

At first these negotiations involved only three parties—Stevenson, Hsu, and Wing Chung Ho (an indicted co-conspirator residing in Singapore). But in June, Stevenson informed Hsu and Ho that although he would ship the units domestically, he would not personally export them, and so Hsu and Ho would have to find someone Stevenson could trust to actually export the units. Eventually, Ho informed Stevenson that David Tzuwei Yang, a freight forwarder residing in California, would serve as that person.

Stevenson initially spoke with Yang on July 25, 2001, and continued to discuss the illegal exportation with him numerous times over the following month. During the course of these conversations, Stevenson repeatedly informed Yang that export of the KIV units required a license and that a license would not be approved if the end-user was in China, and even expressly stated that export of a unit without the required license violated the law. Yang displayed some initial reluctance but eventually agreed that Stevenson would ship Yang two encryption devices, Yang would export the devices to Ho in Singapore, and Ho would ultimately send them to the end-user in China. Stevenson shipped the devices to Yang on August 27, and the following day, after Yang received the equipment, authorities arrested Hsu and Yang.

A jury convicted Hsu and Yang (collectively "Defendants") of two criminal offenses: (1) conspiracy to export Munitions List articles without a license in violation of the AECA or to make materially false statements to the United States Customs Service in violation of 18 U.S.C. § 371 (2000), and (2) attempt to export items covered by the Munitions List without a license, in violation of the AECA.

## II.

Defendants first contend that the AECA and its implementing regulations are unconstitutionally vague as applied to them. In particular, they argue that the regulations fail to provide sufficient clarity as to what encryption devices qualify as "military," and so are included on the Munitions List. *Id.* We review challenges to the constitutionality of a statute or regulation *de novo.* *United States v. Sun,* 278 F.3d 302, 308–09 (4th Cir.2002).

■ "Due process requires that a criminal statute provide adequate notice to a person of ordinary intelligence that his contemplated conduct is illegal, for no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Buckley v. Valeo,* 424 U.S. 1, 77, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam) (internal quotation marks and citations omitted). But "where, as here, a criminal statute regulates economic activity, it generally is subject to a less strict vagueness test." *Sun,* 278 F.3d at 309 (internal quotation marks and citation omitted).

■ Moreover, because Defendants do not maintain that the AECA or its implementing regulations implicate First Amendment freedoms, we must examine their vagueness challenge "in light of the facts of the case at hand." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 495 n. 7, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982) (internal quotation marks and citations omitted). Thus, the question of whether the AECA or its regulations suffice to provide a hypothetical defendant fair notice as to what encryption devices qualify as "military," and so require an export license, is not before us. Rather, we need only determine whether the statute and regulations were vague as applied to these particular defendants—i.e., whether Hsu and Yang *in fact* had fair notice that the statute and regulations proscribed their conduct. We have no difficulty concluding that they did.

The particular regulation upon which Defendants base their vagueness challenge states that the Munitions List includes "cryptographic devices . . . specifically designed or modified for military purposes." 22 C.F.R. § 121.1, Category XIII(b). To qualify as a "military" encryption device, a product must be "specifically designed, developed, configured, adapted, or modified for a military application," *and* (1) have no "predominant civil application[ ]" or "per-

formance equivalent" used for civil applications, *or* (2) have "significant military or intelligence applicability such that control under this subchapter is necessary." 22 C.F.R. § 120.3. Defendants contend that these regulations "do not make clear what encryption products are covered by the Munitions List." Brief of Appellants at 26.

But the government charged, and the jury convicted, Defendants of "knowingly and willfully" violating the AECA when they acted to export the encryption devices. It is well-established that such a "scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Hoffman Estates*, 455 U.S. at 499, 102 S.Ct. 1186; *accord Sun*, 278 F.3d at 309. After all, under the specific intent required as an element of this offense, the government must prove that a defendant intended to violate the law to obtain a conviction, thereby eliminating any genuine risk of holding a person "criminally responsible for conduct which he could not reasonably understand to be proscribed." *Sun*, 278 F.3d at 309; *accord Screws v. United States*, 325 U.S. 91, 103–04, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945).

Not surprisingly, several courts have recognized the importance of the AECA's "knowing and willful" scienter requirement in denying as-applied vagueness challenges to the Act. *See United States v. Lee*, 183 F.3d 1029, 1032–33 (9th Cir.1999) (stating that inclusion of a scienter requirement in the AECA "protects the innocent exporter who might accidentally and unknowingly

export a proscribed component or part whose military use might not be. apparent"); *see also United States v. Swarovski*, 592 F.2d 131, 132 (2d Cir.1979) (noting, under predecessor statute, 22 U.S.C. § 1934 (1970), that defendant's vagueness argument "comes with little grace from one who was fully cognizant of the wrongfulness of his acts"). In fact, recently we expressly rejected an as-applied vagueness challenge to the AECA and its implementing regulations. *Sun*, 278 F.3d at 309–10. We explained that because the AECA permits an arrest only if an individual acts "with the requisite criminal intent," it cannot be deemed constitutionally vague as-applied. *Id.* at 309.[1]

Nor do we find persuasive Defendants' argument that vagueness problems persist here because an undercover agent posing as a sales representative, rather than the government qua government, informed them of the illegality of the proposed exportation. Fair notice requirements are simply not implicated when a defendant engages in conduct *knowing* it is illegal, regardless of how he procured this information. *See United States v. Malsom*, 779 F.2d 1228, 1234–35 (7th Cir.1985) (finding specific intent when an export shipper and a friend warned defendant that an export license was required); *see also Swarovski*, 592 F.2d at 132–33 (finding no constitutional vagueness when manufacturer provided notice). Here, the jury was required to determine not whether Defendants were "informed" that the export was illegal, but whether they subjectively "knew" they were violating the law, either by crediting

---

1. Defendants attempt to distinguish *Sun* by focusing on factual differences between it and the case at hand. Specifically, they argue that, unlike the defendants in *Sun*, they were not experienced "munitions exporters" and the encryption devices here, unlike the missile and bomb parts at issue in *Sun*, are not exclusively designed for military use. Brief of Appellants at 35. These factual differences, however, do not change the legal analysis. The reasoning in *Sun*—that requiring the jury to find a defendant acted "willfully" necessarily leaves "innocent" exporters outside the statute's scope and so vitiates any vagueness concerns—applies equally here.

Stevenson's protestations of illegality or by obtaining this knowledge from another source. The jury made this finding—that Defendants acted "willfully"—thus ensuring Defendants had this requisite knowledge.[2]

Accordingly, the AECA and its implementing regulations are not unconstitutionally vague as applied to Defendants.

## III.

Defendants next contend that the district court erred in refusing to instruct the jury on entrapment. We review the district court's refusal to give an entrapment instruction *de novo*. *United States v. Phan*, 121 F.3d 149, 154 (4th Cir.1997).

## A.

■ An entrapment defense consists of "two related elements": (1) government inducement to commit a crime and (2) the lack of predisposition on the part of the defendant to engage in criminal conduct. *Mathews v. United States*, 485 U.S. 58, 62–63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The first element, "inducement," requires more than mere solicitation by the government, *United States v. Velasquez*, 802 F.2d 104, 106 (4th Cir.1986); "inducement" is a

"term of art" necessitating "government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *United States v. Daniel*, 3 F.3d 775, 778 (4th Cir.1993); *see also United States v. Gendron*, 18 F.3d 955, 961–62 (1st Cir. 1994) (describing examples of government overreaching constituting inducement). The second element, "predisposition," refers to "the defendant's state of mind before government agents make any suggestion that he shall commit a crime," *United States v. Osborne*, 935 F.2d 32, 37 (4th Cir.1991); the government does not entrap a defendant, even if he does not specifically contemplate the criminal conduct prior to this "suggestion," if "his decision to commit the crime is the product of his own preference and not the product of government persuasion." *Id.* at 38.

Generally entrapment presents a jury question, *Mathews*, 485 U.S. at 62, 108 S.Ct. 883, but this is not invariably the case. *Osborne*, 935 F.2d at 38. Because entrapment is an affirmative defense, a defendant first bears the "initial burden" of producing "more than a scintilla of evidence of entrapment." *Phan*, 121 F.3d at 154. And a defendant is only "entitled to an entrapment instruction [when] there is

---

**2.** Defendants unpersuasively argue that the scienter requirement did not alleviate fair notice concerns in this case because of assertedly inadequate jury instructions. They contend that the instructions as to "willfulness" were deficient because the "jury was not instructed that the government had to show that the defendants knew that the KIV–7HS was covered by the Munitions List ... [or that] the device was designed for military use." Brief of Appellants at 31. Whatever specificity on "willfulness" is required, it is clear that this extremely particularized definition finds no support in the case law. Indeed, at least one court has expressly rejected it. *See United States v. Murphy*, 852 F.2d 1, 7 & n. 6 (1st Cir.1988). This conclusion also forecloses Yang's related contention that the government

presented insufficient evidence from which a jury could find that he acted "willfully" because of the asserted lack of evidence that Yang knew "the KIV units were on the Munitions List" or "military items." Brief of Appellants at 37. Yang additionally contends that the Government offered insufficient evidence "that what [the Defendants] were proposing to do was illegal." *Id.* That argument is equally meritless. In fact, the record demonstrates that Stevenson not only expressly told Yang "that what they were proposing to do was illegal," but also repeatedly reminded him that a license was required to export the KIV units, and that the required license could not be procured because the end-user was in China.

sufficient evidence from which a reasonable jury could find entrapment." *Mathews*, 485 U.S. at 62, 108 S.Ct. 883. Hence, a "court may find as a matter of law that no entrapment existed, when there is no evidence in the record that, if believed by the jury, would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready and willing to commit it." *Osborne*, 935 F.2d at 38.

Defendants acknowledge their initial burden to "show that there is more than a scintilla of evidence that the government induced [the]m to commit the crime," but assert that they need not "point to evidence on the issue of predisposition." Brief of Appellants at 38, 44. Focusing solely on the inducement element, they contend that a defendant "may carry [t]his burden on the inducement issue" by producing evidence of: (1) government solicitation plus "unreadiness" on the defendant's part *or* (2) "government solicitation plus actual persuasion or other pressure by the government." *Id.* at 39. In so

arguing, Defendants fundamentally misunderstand our precedents. Actually, *only* through the second method can a defendant carry his burden on the inducement issue; he *must* offer more than a scintilla of evidence of solicitation, plus "actual persuasion or other pressure by the government."

In support of their contrary contention, Defendants seize on dicta from *United States v. DeVore*, 423 F.2d 1069, 1071 (4th Cir.1970). There, after correctly explaining that "a showing of solicitation alone" would not suffice "to place the burden of going forward" on the government, we remarked that a defendant "must also produce some evidence of unreadiness on his part, or of persuasion by the agent." *Id.*[3] Although we have repeated this dicta on occasion, *see Osborne*, 935 F.2d at 39; *United States v. Tindle*, 808 F.2d 319, 329 (4th Cir.1986), we have never so held. On the contrary, when a defendant offered some evidence of his "unreadiness" *and* government "solicitation," but failed to of-

**3.** *DeVore* derived this dicta from *Kadis v. United States*, 373 F.2d 370, 373–74 (1st Cir. 1967), in which the First Circuit announced that it would no longer bifurcate the entrapment defense into "sub-issues of inducement and predisposition," but instead would look "at the ultimate question of entrapment." *Id.* at 374. Under this unified standard, to satisfy his initial burden a defendant would have to show "some indication that a government agent corrupted him," but "such a showing [could not be] made simply by evidence of a solicitation. There must be some evidence tending to show unreadiness." *Id.* In this context, it seems clear that "unreadiness" corresponds to what had theretofore been known as the "predisposition" element of the entrapment defense, while the "solicitation" showing informs the "inducement" element. Thus, viewing the entrapment defense in this unitary fashion, a defendant must necessarily produce prima facie evidence on *both* "elements" of entrapment—inducement (i.e. solicitation) and lack of predisposition (i.e. unreadiness)—to warrant an

entrapment instruction. (We recognize that the *Kadis* court referred only to "solicitation" in referencing the first element, but at the time it decided *Kadis* the First Circuit did not always differentiate between "solicitation" and "inducement." *See, e.g., Sagansky v. United States*, 358 F.2d 195, 202 (1st Cir. 1966)). Indeed, later First Circuit cases have adopted precisely this interpretation; using the terms "predisposition" and "unreadiness" virtually interchangeably, they require prima facie evidence of this second element, *as well as* the first element, defined as solicitation plus government overreaching or improper conduct. *See, e.g., United States v. Gamache*, 156 F.3d 1, 9 (1st Cir.1998); *United States v. Joost*, 92 F.3d 7, 12 (1st Cir. 1996); *United States v. Rodriguez*, 858 F.2d 809, 812–16 (1st Cir.1988). Under this approach, a showing of "unreadiness" would satisfy the defendant's prima facie burden as to the "predisposition" element; it would not, however, have any bearing on the "inducement" element.

fer any evidence of government over-reaching accompanying its solicitation, we have held, albeit without discussion of the "unreadiness" element, that the defendant did not warrant an entrapment instruction. *Velasquez,* 802 F.2d at 106 (finding that although defendants offered evidence that "government cooperator[ ] telephoned defendants over thirty times to 'suggest'" that defendants "acquire cocaine for [him] before they acquiesced," an entrapment instruction was not warranted).

. The analysis in *DeVore* itself fully accords with this view. In *DeVore,* the court found insufficient evidence to warrant an entrapment instruction because DeVore offered no evidence of "'inducement' ... only solicitation." *DeVore,* 423 F.2d at 1072. If the *DeVore* court had actually *held* that inducement could also be shown by evidence of "solicitation plus unreadiness," as Defendants contend, then it would have gone on to explore whether DeVore had offered evidence of "unreadiness." But the court did not engage in any analysis of DeVore's "unreadiness"; rather, in determining whether DeVore had produced evidence of inducement, the court focused exclusively on the absence of "any excessive behavior on the part of the government." *Id.* Thus, neither *DeVore* nor any other case cited by Defendants holds that inducement can be defined as "solicitation plus unreadiness."

Furthermore, Defendants' definition of inducement would contravene the standard set forth in *Mathews*—that a court cannot give an entrapment instruction when there is *insufficient* "evidence from which a reasonable jury could find entrapment." *Mathews,* 485 U.S. at 62, 108 S.Ct. 883. Instructing a jury based solely on a showing of "solicitation plus unreadiness," as Defendants urge, would do just that: "solicitation" alone does not amount to inducement, and "unreadiness" speaks only to the predisposition element. Therefore, a jury could not find entrapment based solely on these two factors. Moreover, the very reason why solicitation alone does not constitute inducement—"it is not the kind of conduct that would persuade an otherwise innocent person to commit a crime," *DeVore,* 423 F.2d at 1071—forecloses Defendants' definition of inducement as "solicitation plus unreadiness." This is so because simply "soliciting" an otherwise "innocent" or "*unready*" person would not be persuasive enough "to implant a criminal design in [his] mind." *Daniel,* 3 F.3d at 778.

■ Therefore, to be entitled to an entrapment instruction, a defendant must produce "more than a scintilla" of evidence of "inducement," defined as solicitation *plus* some overreaching or improper conduct on the part of the government.[4] In

4. We have not been entirely consistent as to whether a defendant must *also* come forward with some evidence demonstrating a lack of predisposition (or "unreadiness") prior to submitting an entrapment defense to the jury. *Compare United States v. Blevins,* 960 F.2d 1252, 1257 (4th Cir.1992) (stating that "defendant has the initial burden of presenting more than a scintilla of evidence establishing these *two* elements[,]" referring to inducement and lack of predisposition) (emphasis added), *with United States v. Sligh,* 142 F.3d 761, 762 (4th Cir.1998) (stating that "the defendant has the initial burden to produce more than a scintilla of evidence that the

government induced him to commit the charged offense, before the burden shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime") (internal quotation marks and citation omitted). Other circuits have divided on this question. *See United States v. Whoie,* 925 F.2d 1481, 1483 (D.C.Cir.1991) (explaining different approaches). Courts that ascribe to a "unitary" approach on entrapment require the defendant to establish a prima facie case of entrapment as a whole, i.e., inducement and lack of predisposition. *See, e.g., United States v. El-Gawli,* 837 F.2d

setting forth this standard, we do not announce a new rule; rather we merely disavow some confusing dicta and adhere to the approach we have followed for several decades. With the proper definition of inducement in mind, we turn to the question of whether the district court erred in concluding that Defendants failed to offer more than a scintilla of evidence of inducement.

### B.

We first discuss the application of this definition to Hsu and then to Yang.

### (i)

Hsu, unlike most defendants who contend government agents entrapped them, initiated discussion of the scheme; Hsu telephoned Mykotronx to request information on the company's KIV encryption device. At that time, however, Hsu did not know that export of the device would violate the law. Stevenson, the government agent, informed Hsu of the illegality of the transaction in their very first conversation, but also stated that he would be willing to arrange a sale if Hsu had "a way to get [the devices] out of" the country. Thus, although Stevenson did not initiate discussions with Hsu, he did solicit Hsu, in that he provided Hsu with an opportunity to commit a crime.

But, as even Defendants concede, solicitation does not constitute inducement, and evidence of solicitation does not entitle a defendant to an instruction on entrapment. *See, e.g., United States v. Singh,* 54 F.3d 1182, 1189 (4th Cir.1995); *Daniel,* 3 F.3d at 778. Rather, Hsu must offer some evi-

dence of government overreaching, *Daniel,* 3 F.3d at 778; some "excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive." *Gendron,* 18 F.3d at 961. After scouring the record, we cannot find even a scintilla of such evidence.

Not only did Hsu initially request information on the KIV unit, albeit without knowing that its export was illegal, but even *after* being informed of the illegality, Hsu telephoned Stevenson again, on his own initiative, to determine how to "proceed" with the illegal sale. In subsequent conversations to finalize the sale, Stevenson informed Hsu more than a dozen times that exportation of the KIV units violated the law; yet Hsu never indicated he did not want to go forward with the illegal sale.

At *no* time during the three-month negotiation process did Stevenson threaten Hsu, *see United States v. Groll,* 992 F.2d 755, 759 (7th Cir.1993), or his family, *see United States v. Becerra,* 992 F.2d 960, 963 (9th Cir.1993). At no time did the agent play upon Hsu's weaknesses, *see United States v. Kessee,* 992 F.2d 1001, 1003–04 (9th Cir.1993), or attempt to engender improper sympathy for the agent, *see United States v. Sullivan,* 919 F.2d 1403, 1419 n. 21 (10th Cir.1990). Hsu does not even suggest to the contrary.

■ Instead, in support of his case of government overreaching, Hsu points only to Stevenson's alleged offer of "rewards" for Hsu's participation and his "constant high-pressure effort ... to push Hsu along." Brief of Appellants at 40. A fair

---

142, 145–46 (3d Cir.1988); *Rodriguez,* 858 F.2d at 814. But in those jurisdictions following a "bifurcated" approach, the defendant need only produce some evidence as to inducement before the burden shifts to the government to prove the defendant was pre-

disposed. *See, e.g., Whoie,* 925 F.2d at 1483–84. Because we have concluded that Defendants have failed to produce sufficient evidence of government *inducement,* in this case Defendants would not be entitled to a jury instruction under either approach.

reading of the record reveals that the passing mention of these "rewards"—that Hsu's friend in China could be an "exclusive representative" and that Hsu would be paid a percentage of "mail services"— were mere banter. At most they were only the most mild form of persuasion; they were certainly not sufficient to "implant a criminal design in the mind of an otherwise innocent party" and so do not "present evidence of inducement." *Daniel*, 3 F.3d at 778–79 ("Our precedents leave no doubt that ... mild forms of persuasion ... don't present evidence of inducement."). Similarly, although Stevenson could fairly be described as a somewhat persistent (and loquacious) salesperson, he never pressured Hsu to complete the sale; indeed Stevenson's frequent warnings about the illegality of the export would likely have persuaded an "otherwise innocent party," *id.* at 778, to back out of the deal.

In sum, Hsu failed to satisfy his initial burden and accordingly, the district court did not err in refusing to give him an entrapment instruction.

(ii)

Perhaps even more than Hsu, Yang emphasizes the evidence he offered as to his own "unreadiness." But, as explained above, this evidence is of no moment *unless* Yang can demonstrate prima facie evidence of inducement, i.e., government solicitation plus some sort of government overreaching. *Singh*, 54 F.3d at 1189; *Daniel*, 3 F.3d at 778. Like Hsu, however, Yang fails to offer evidence to establish even a prima facie case of inducement.

■ First, any actual government "solicitation" of Yang was only of the most indirect nature. Stevenson did not specifically pursue Yang. Rather, not wanting to be the only one taking the risk by personally shipping the KIV units out of the United States, Stevenson simply sought somebody, anybody (including Hsu or Ho), who would be willing to receive the units domestically and export them. Indeed, on several occasions, Stevenson indicated a desire to work with a forwarder other than Yang, and suggested pursuing a different means of export altogether. But even assuming that Stevenson could be said to have directly solicited Yang, clearly Stevenson never coerced or pressured Yang so as to "displace [Yang's] *mens rea.*" *Osborne*, 935 F.2d at 38 (internal quotation marks and citations omitted).

Yang, like Hsu, does not suggest that Stevenson attempted to threaten him or his family, prey on his weaknesses, or invoke improper sympathy for the government agent. Rather, Yang's case for government, overreaching rests entirely on derivative entrapment, a legal theory we have previously rejected, and the contention that the frequency of Stevenson's telephone calls constitutes improper government persuasion. Neither of these arguments persuade us.

First and principally, Yang maintains that Ho and Hsu "repeated[ly]" solicited him and that their high-pressure tactics should be imputed to the government on a theory of "derivative entrapment." Brief of Appellants at 48–50. However, we have expressly refused to recognize derivative entrapment as a basis for an entrapment defense. *See United States v. Squillacote*, 221 F.3d 542, 573–74 (4th Cir.2000) ("[I]n the Fourth Circuit, a defendant cannot claim an entrapment defense based upon the purported inducement of a third party who is not a government agent if the third party is not aware that he is dealing with a government agent."). Yang acknowledges this but asks us to "reconsider [our] position." Brief of Appellants at 49. But, of course, one panel cannot "reconsider" the

holding of another. *Jones v. Angelone*, 94 F.3d 900, 905 (4th Cir.1996).

■ Alternatively, Yang argues that the mere frequency of Stevenson's calls suffices to qualify as government persuasion. Excessive phone calls from a government agent could, in the proper circumstances, amount to the extra pressure needed to transform solicitation into inducement. *See, e.g., United States v. Acosta*, 67 F.3d 334, 338 (1st Cir.1995). But they do not do so here.

Viewed in context, the frequency of Stevenson's calls simply reflect an ongoing business negotiation requiring communication among several parties in different time zones. Moreover, Stevenson initiated several of the calls at the direction of Ho or in response to Yang himself, and on a number of occasions they represented failed efforts to reach Yang in his office. Furthermore, the content of these calls does not reveal the use of any high-pressure tactics. Rather, as he did in his telephone calls with Hsu, Stevenson repeatedly warned Yang that exporting the KIV units to China without a license, which could not be obtained, violates the law. For example, in the short August 16 telephone call, on which Yang particularly relies, Stevenson told Yang three times that he could not "get a license" and also explained that it was "not legal, you know, to do it" without a license. Far from exerting excessive pressure on Yang to join the criminal scheme, the record indicates that Stevenson almost pressured Yang to leave it, stating on one occasion that "if we're all gonna work together, we'll work together ... [b]ut if not, then, then no." Thus the repeated calls in this case do not constitute government inducement.

In sum, Yang too failed to satisfy his initial burden. Thus, the district court did not err in refusing to give Yang an entrapment instruction.

## IV.

Defendants' other three arguments can be resolved with less discussion.

## A.

First, Defendants contend that the district court abused its discretion in refusing to inquire further during voir dire into the occupations of prospective jurors and their spouses. Although jurors were given a printout requesting this information prior to trial, several jurors left these questions blank, and the district court denied Defendants' request to supplement the questionnaires by inquiring about the missing information during voir dire.

The conduct of voir dire is committed to the sound discretion of the district court, and thus it is only a "rare case in which a reviewing court will find error in the trial court's conduct...." *Sasaki v. Class*, 92 F.3d 232, 239 (4th Cir.1996); *accord United States v. Lancaster*, 96 F.3d 734, 738 (4th Cir.1996) (en banc).

■ Here, the jury was asked to fill out a form divulging their name, age, address, occupation, employer, employer's address, and spouse's occupation. In addition, the district court asked the jurors more than twenty questions during voir dire, six of which addressed employment issues and established whether the prospective jurors or any of their friends or relatives (implicitly including their spouses) were: employed by a state, local, or federal law enforcement agency; employed or received training in the import-export, freight forwarding, or customs brokering business; employed or received training in the legal field; self-employed; or served in the military. Thus, far from knowing nothing about the eighteen potential jurors who failed to fill out some of the requested

occupational information, Defendants were able to conclude that these jurors (and their spouses) were *not* within one of these six rather broad categories. Ultimately, Defendants only lacked *affirmative* information on two of the potential jurors.

In sum, after "examin[ing] the voir dire as a whole," we are convinced that it was "reasonably sufficient to probe the prospective jurors for bias and partiality." *Lancaster,* 96 F.3d at 742. Accordingly, this does not represent one of those "rare cases," *Sasaki,* 92 F.3d at 239, in which the district court abused its discretion.

### B.

■ We turn next to Defendants' assertion that the district court's interim instructions erroneously stated the law, unduly prejudicing Defendants' case. We review claims that a jury instruction failed to state the law accurately *de novo. United States v. Cherry,* 330 F.3d 658, 665 (4th Cir.2003).

In the midst of Stevenson's testimony, the district court *sua sponte* halted the proceedings to give the jury interim instructions. As part of these instructions, the court described "five different levels" of fact-finding in which the jury would engage: (1) whether Stevenson was in fact a government agent and whether he made the phone calls; (2) what the speaker actually said during the phone calls; (3) what the speaker intended to communicate; (4) what a "reasonable person hearing the words would have understood them to mean"; and (5) "what the defendant understood the words that were spoken to him" to mean, and "what the defendant intended to convey." Defendants contend that the fourth level of fact finding, referring to the "reasonable person," incorrectly stated the law because the crimes charged required specific intent.

Generally, the "reasonable person" standard has no place in instructions pertaining to a specific intent crime. *See United States v. George,* 266 F.3d 52, 60 (2d Cir. 2001). To determine whether jury instructions require reversal, however, we assess the instructions as a whole and view them in context. *See United States v. Muse,* 83 F.3d 672, 677 (4th Cir.1996).

■ In this case, the district court made two references to the "reasonable person"; first as part of the "five levels" of fact-finding, and second when discussing how the jury should evaluate the government agent's testimony. The first reference was immediately followed by the instruction that the jury must determine what "the defendant understood" and "what the defendant intended to convey." The second reference occurred when the court explained that it had admitted evidence of the agent's "state of mind" only to "assist [the jury] in determining what, for example, a reasonable person would have thought was intended or understood, *but not as substantive evidence of anybody's guilt in this case.*" Viewed in this light, we are confident that the jurors proceeded under a proper understanding of the governing law. Moreover, if any ambiguity remained after the interim instructions, the final jury instructions, which made no mention of the "reasonable person," sufficiently clarified the proper standard. Thus, while perhaps ill-advised, the interim instructions do not constitute reversible error.

### C.

Defendants finally contend that we must vacate their attempt convictions because the State Department has not been delegated the authority to punish attempts, and any such delegation would be unconstitutional. These contentions are without merit.

■ The AECA broadly delegates authority to the President (which, in turn, he

has delegated to the Secretary of State, *see ante* at 194), to issue regulations "to control the import and the export of defense articles," and authorizes a criminal penalty for violation of those regulations. § 2778(a)(1), (c). The regulation punishing the attempt to export these proscribed articles without a license, 22 C.F.R. § 127.1(a)(1), falls squarely within this delegated authority, and is fully consonant with Congress's "broad authority to [delegate to] the President in foreign affairs." *United States v. Gurrola–Garcia*, 547 F.2d 1075, 1079 (9th Cir.1976); *cf. United States v. Mechanic*, 809 F.2d 1111, 1113–14 (5th Cir.1987) (holding that the regulation punishing attempts under a similar statute, the Export Administration Act, was valid *prior* to a statutory amendment explicitly including attempt as a punishable offense).

In fact, "stop[ping] smugglers as they approach an international border, to confiscate their munitions and to impose upon them criminal sanctions" is an especially "effective means of controlling the exportation of listed munitions." *Gurrola–Garcia*, 547 F.2d at 1077. It would be nonsensical to hold otherwise. *Id.* (noting that if the government had to wait for defendants to export the proscribed items "the violator would [then] be outside the jurisdiction of the law enforcement officers and courts directed to penalize him for the crime").[5] Thus, Defendants' final contention also fails.

### V.

For all of the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

---

**5.** The two other circuits to address this question have arrived at the same conclusion. *See Gurrola–Garcia,* 547 F.2d at 1078–79 (discussing predecessor statute); *Samora v. United States,* 406 F.2d 1095 (5th Cir.1969) (same).