**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 06-4538

UNITED STATES OF AMERICA,

              Plaintiff – Appellee,

      v.

JAMES WRIGHT,

              Defendant – Appellant.

Appeal from the United States District Court for the District of
Maryland, at Baltimore.   Richard D. Bennett, District Judge.
(1:05-cr-00078-RDB)

Argued: March 27, 2009              Decided: April 28, 2009

Before WILKINSON, MOTZ, and GREGORY, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**ARGUED:** Danielle Tarin, WHITE & CASE, Washington, D.C., for
Appellant.   James Thomas Wallner, OFFICE OF THE UNITED STATES
ATTORNEY, Baltimore, Maryland, for Appellee.   **ON BRIEF:** Jonathan
M. Mastrangelo, WHITE & CASE, Washington, D.C., for Appellant.
Rod J. Rosenstein, United States Attorney, Baltimore, Maryland,
for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

This case arises out of defendant's participation in a controlled drug buy. A jury found defendant guilty of one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, 21 U.S.C. § 846, 21 U.S.C. § 841(a)(1) and (b)(1)(A); and one count of possession with intent to distribute 50 grams or more of cocaine base, 21 U.S.C. § 841(a)(1) and (b)(1)(A), and aiding and abetting the same, 18 U.S.C. § 2. Defendant appeals his conviction on multiple grounds. We affirm the judgment.

I.

A.

On September 14, 2004, a group of law enforcement officers met with Jeffrey Saffell, a confidential informant they had used previously, and directed him to call defendant James Wright to arrange a purchase of cocaine base. Saffell had known defendant for two years and had obtained drugs from him in the past. Just as he had done before, Saffell called defendant at home to set up the buy. In less than five minutes, Saffell arranged to purchase drugs from defendant and agreed on a time that he would pick up defendant. The officers monitored and recorded this phone call, but one of the officers subsequently lost the tape recording. The officer testified that he lost the tape while

2

moving when he was transferred back to headquarters the day after the incident. There is no allegation that any bad faith was involved.

Next, as is customary with a controlled buy, one of the officers searched Saffell to ensure that he was not in possession of any contraband, money, or drug paraphernalia. The officers then gave Saffell $2,000 to purchase the drugs, a scale to weigh the drugs, and a vehicle to use for the operation. Saffell was wired with a radio transmitter and the vehicle was equipped with a video recorder and radio transmitter.

Driving the government vehicle, Saffell then picked defendant up at home, just as he had done during their prior drug transactions. Almost immediately upon entering the car, defendant asked Saffell "What's up? What you trying to do?" Saffell responded in slang that he was trying to get two ounces of crack cocaine. Without any hesitation or delay, defendant borrowed Saffell's phone to call one of his drug suppliers -- one of his "sources" or "connects." The source agreed to provide the drugs, but said that it would take fifteen minutes.

This source took too long, so defendant called another one of his sources. They arranged to meet, but the transaction was further delayed because there were too many police officers in the neighborhood where they had chosen to meet. While defendant and Saffell were waiting for defendant's sources, they drove

3

around Baltimore to "burn time" and had an extensive, almost two hour conversation about drug dealing, women, and other aspects of their lives. They also made two stops: one at a convenience store to buy cigarettes and one at a truck driving business so that defendant could pick up a job application. Except for the two stops, the entire conversation between defendant and Saffell was recorded by the video camera in the car.

Ultimately, defendant was successful in setting up the drug buy with Dante Couther, someone whom Saffell recognized from a previous drug transaction arranged by defendant. Saffell testified that they picked Couther up in the car and gave him the $2,000; they then drove Couther to another location where he obtained the cocaine; and finally, Couther gave the cocaine to defendant who quickly examined it and then handed it over to Saffell. The transaction was complete.

Saffell dropped off defendant and Couther, and then met up with the police officers who had been monitoring the operation. He gave the officers the two ounces (approximately 55 grams) of cocaine that he had purchased through defendant. The police immediately arrested defendant and Couther.

B.

A grand jury indicted defendant and Couther on one count of conspiracy to distribute and possess with intent to distribute 50 grams or more of cocaine base, 21 U.S.C. § 846, 21 U.S.C. §

4

841(a)(1) and (b)(1)(A); and one count of possession with intent to distribute 50 grams or more of cocaine base, 21 U.S.C. § 841(a)(1) and (b)(1)(A), and aiding and abetting the same, 18 U.S.C. § 2. Defendant was tried before a jury beginning on September 12, 2005. The government's case-in-chief included testimony from Saffell and the officers who arranged and monitored the controlled buy. During Saffell's testimony, the government played portions of the videotape of the car ride. The government also provided the jury with a transcript of the video to use as an aid, but the transcript was not entered into evidence.

During cross-examination, defendant's counsel elicited testimony from various witnesses to undermine Saffell's credibility, including that he breached the plea agreement he was cooperating under by participating in unauthorized drug transactions. Defendant's counsel also pointed out that the officers committed several minor errors in executing and documenting this operation that deviated from police practice.

At the close of the government's case-in-chief defendant made a motion for judgment of acquittal on three grounds: (1) the denial of due process premised on the government's mishandling of various evidence, including the loss of the tape of Saffell's initial conversation with defendant and alleged inconsistencies in testimony; (2) the defense of entrapment; and

5

(3) the sufficiency of the evidence. The court denied defendant's motion. Of relevance to this appeal, the court rejected defendant's entrapment claim because he had not met his initial burden of presenting evidence that the government induced him to commit the crime. In addition, the court ruled that because defendant did not request a jury instruction on entrapment, he could not argue entrapment to the jury.

Defendant also moved that the jury be instructed that it could draw an inference that the lost tape was adverse to the government's case. Exercising its discretion, the court denied the instruction because, as defendant conceded, there was no evidence that the government had acted in bad faith when it lost the tape. Defendant did not testify and did not present any additional evidence.

The jury convicted defendant of both counts on September 15, 2005. He was later sentenced to 240 months of imprisonment. Defendant appeals his conviction.

## II.

All of defendant's arguments relate in some way to the defense of entrapment. Entrapment is an affirmative defense that consists of "two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." Mathews v. United

States, 485 U.S. 58, 62-63 (1988); see also United States v. Hsu, 364 F.3d 192, 198 (4th Cir. 2004) (citing Mathews, 485 U.S. at 62-63). Here, defendant did not meet his initial burden of producing "more than a scintilla of evidence" that the government induced him to commit the crime.[*] See Hsu, 364 F.3d at 200 (internal quotation marks omitted); see also United States v. Sligh, 142 F.3d 761, 762 (4th Cir. 1998).

Inducement "is a term of art: it involves elements of governmental overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." United States v. Daniel, 3 F.3d 775, 778 (4th Cir. 1993); see also Hsu, 364 F.3d at 198 (quoting Daniel, 3 F.3d at 778). It requires "excessive behavior" by the government that is "so inducive to a reasonably firm person as likely to displace mens rea." United States v. DeVore, 423 F.2d 1069, 1072 (4th Cir. 1970); see also United States v. Osborne, 935 F.2d 32, 38 (4th Cir. 1991) (quoting DeVore, 423 F.2d at 1072).

To support his claim of inducement, defendant first points to the fact that the government initiated the drug transaction and solicited him to broker the drug deal. It is well established that this evidence is not sufficient because

---

[*] Defendant's claim that he was entitled to present an entrapment defense to the jury also fails because defendant did not request a jury instruction on entrapment.

7

inducement "requires more than mere solicitation by the government." Hsu, 364 F.3d at 198; see also United States v. Ramos, 462 F.3d 329, 334 (4th Cir. 2006); United States v. Velasquez, 802 F.2d 104, 106 (4th Cir. 1986).

Next, defendant points to the statements Saffell made during the car ride. Specifically, defendant alleges that Saffell offered him money and sex with women to broker the deal, played on defendant's sympathy by stating that he needed money for his daughter's mother, invoked his love for defendant, coached defendant on how to complete the transaction, and assured defendant that no one had ever been caught with him. Some forms of "persuasion or appeals to sympathy" can constitute inducement, United States v. Squillacote, 221 F.3d 542, 569 (4th Cir. 2000), but Saffell's statements do not come close to the types of pleading and persuasion that courts have held constitute inducement.

In fact, Saffell's statements do not involve pleading or persuasion at all. They were not offered in response to any reluctance by defendant to participate in the buy. The statements all occurred after defendant had begun participating in the transaction by calling one of his sources to supply the drugs. And defendant did not later show any reluctance to participate when he and Saffell were waiting for his sources to come through. Defendant notes that he stated "once I get this

8

money together it's game over," and that he picked up a job application while they were waiting, but these facts show at most that defendant was going to seek legitimate employment <u>after</u> completing this deal, which was already underway.

Similarly, defendant claims that Saffell offered him money to complete the deal, but payment for arranging a deal is normal in the context of a drug buy and is not generally sufficient to demonstrate inducement.  <u>See, e.g.</u>, <u>United States v. Diaz-Diaz</u>, 433 F.3d 128, 136 (1st Cir. 2005); <u>United States v. Glover</u>, 153 F.3d 749, 754 (D.C. Cir. 1998).  This case is thus a far cry from a situation where the government had to make multiple requests "to overcome, first, petitioner's refusal, then his evasiveness, and then his hesitancy in order to achieve capitulation." <u>Sherman v. United States</u>, 356 U.S. 369, 373 (1958).  <u>See also</u> <u>Sligh</u>, 142 F.3d at 763 (finding evidence of inducement where the defendant "repeatedly ignored the agent's invitations to wrongdoing," but "the agent nevertheless persisted in her baiting of [the defendant]").

Indeed, courts have found inducement only where the pleas were extreme: where an undercover agent pleaded that "unless his 'blood brother' would help him land a cocaine deal he would be killed," <u>United States v. McLernon</u>, 746 F.2d 1098, 1113 (6th Cir. 1984); where a government informant was in a narcotics addiction treatment program and preyed on the defendant's

9

sympathy by repeatedly requesting narcotics because he was suffering from withdrawal, Sherman, 356 U.S. at 373; and where an undercover informant convinced the defendant to cooperate based on "a tale of financial woes, the need to support a new spouse, and terminal cancer, all the while knowing that [defendant's] sister recently had died of cancer," United States v. Nations, 764 F.2d 1073, 1080 (5th Cir. 1985). Saffell's statements simply do not rise to this level.

In short, none of the statements to which defendant alludes would "persuade an otherwise innocent person to commit a crime." Ramos, 462 F.3d at 334 (quoting Hsu, 364 F.3d at 200). At best, the statements amount to the sort of "mild persuasion" that we have repeatedly held does not constitute inducement. See Hsu, 364 F.3d at 202 (holding that "passing mention" of "rewards" was "mere banter" that at most amounted to mild persuasion); Daniel, 3 F.3d at 778-79 (holding that the government's reminder "that there was money to be made and promise to avoid arousing the attention of the authorities" amounted to only mild persuasion); see also Squillacote, 221 F.3d at 569 (recognizing that mild persuasion is not inducement). The district court was right to observe that this case was "no more than any routine controlled buy," and that "if the evidence in this case is sufficient to carry the burden of showing government inducement," courts would be "hard pressed" to find a case that does not meet the burden.

10

III.

Defendant's next arguments also relate to his entrapment defense, but they are premised directly on the claim that the district court should have imposed spoliation sanctions on the government for losing the tape of Saffell's initial phone call to defendant. First, defendant argues that the lost tape was central to his entrapment defense and therefore the district court should have sanctioned the government by granting his motion for judgment of acquittal.

This argument too must fail. To begin with, the evidence did not have "an exculpatory value that was apparent before the evidence was [lost]." California v. Trombetta, 467 U.S. 479, 489 (1984). To the contrary, Saffell's and the officer's testimony about the initial call -- that it was a controlled call where Saffell arranged to purchase drugs from defendant -- shows that, in all likelihood, the tape would have further inculpated defendant. Moreover, under Arizona v. Youngblood, 488 U.S. 51 (1988), "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58. Here, as defendant conceded, there was no evidence that the government acted in bad faith.

Because defendant cannot meet the standard required for reversal under Trombetta and Youngblood, he tries to import the

civil standard for sanctions for spoliation of evidence. We doubt this standard controls in the criminal context, but even if it did, the severe sanction of an outright acquittal would not be warranted. In view of the absence of any bad faith on the part of the government and in light of the fact that the exculpatory value of the evidence was anything but apparent, the district court cannot be said to have abused its broad discretion by failing to grant the significant sanction defendant seeks. Defendant's trial counsel recognized as much when he stated: "where the issue has arisen in federal criminal cases principally it is whether the Indictment should be thrown out . . . . You have to establish bad faith for that and obviously nobody is arguing that." JA 423.

Finally, defendant argues that the district court should have at least sanctioned the government by granting his motion for an adverse inference instruction. The district court denied defendant's motion because there was no evidence that the government acted in bad faith. This was not an abuse of discretion because without bad faith there was simply no basis for an inference that the tape was adverse to the government. Indeed, the very case upon which defendant explicitly based his proposed instruction requires "bad faith conduct" before an adverse inference instruction can be given. United States v. Wise, 221 F.3d 140, 156 (5th Cir. 2000).

12

IV.

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED