**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 22-4194

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

MAKEL ELBOGHDADY,

Defendant – Appellant.

Appeal from the United States District Court for the Southern District of West Virginia, at Huntington.  Robert C. Chambers, District Judge.  (3:20-cr-00069-1)

Argued:  January 24, 2024                      Decided:  September 9, 2024

Before GREGORY, QUATTLEBAUM, and BENJAMIN, Circuit Judges.

Affirmed in part, vacated in part, and remanded with instructions by published opinion. Judge Benjamin wrote the opinion, in which Judge Gregory joined.  Judge Quattlebaum wrote a separate opinion concurring in part and dissenting in part.

**ARGUED**:  Edward M. Robinson, EDWARD M. ROBINSON, A PROFESSIONAL CORP., Torrance, California, for Appellant.  Jennifer Rada Herrald, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.  **ON BRIEF**: William S. Thompson, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charleston, West Virginia, for Appellee.

DEANDREA GIST BENJAMIN, Circuit Judge:

Makel Elboghdady was convicted of traveling in interstate commerce for the purpose of engaging in illicit sexual conduct in violation of 18 U.S.C. § 2423(b) and (e). The district court refused to allow an entrapment defense and sentenced him to 120 months' imprisonment. Elboghdady now appeals, arguing that he was entitled to an entrapment defense and that his sentence is nevertheless unreasonable. We affirm the district court's entrapment decision but vacate and remand Elboghdady's sentence.

I.

A.

At 7:19 p.m. on February 27, 2020, West Virginia State Police Trooper Jillian Yeager (the undercover officer, or "UC") posted an advertisement titled, "Young momma bear in town for weekend looking for fun for the family," to the Huntington, West Virginia, Craigslist page. J.A. 340. The UC was working undercover with the police department and a Federal Bureau of Investigation task force on Child Exploitation and Human Trafficking. The body of her ad read, "Single mom in town looking for family friendly activities. My little cubs love to play." J.A. 340. She chose to word the ad this way in an effort "to not specifically come out and state the purpose of the ad." J.A. 69. The purpose was to attract child predators that wanted to interact sexually with young children. Elboghdady, an Egyptian-born permanent resident of the United States, responded to the ad the same night it was posted; he sent an email to the UC that read, "I'm interesting,"

2

and attached a photo of himself. J.A. 341–42. Elboghdady is not a native English speaker and struggles with the language.

The two began an exchange that lasted around a day. It included emails, text messages, phone calls, and ultimately led to Elboghdady driving from Columbus, Ohio, to Huntington, West Virginia, for a face-to-face meet up with the UC (collectively, "the timeline"). The timeline is captured in the record in its entirety. For ease of reference, we provide a general synopsis of events by reprinting portions of the timeline.

Shortly after responding to the ad, Elboghdady gave his phone number to the UC, and the conversation moved to text messages. Elboghdady asked for "Pic plz . . . And your girls."[1] J.A. 364.[2] The UC sent a photo of a fictitious mother standing with two young girls, and the following text conservation occurred:

> **Elboghdady**: Wow nice
> **UC**: now a pic of u so I know its u
> **Elboghdady**: Haha I'm real I don't like play games
> **UC**: me either but you cant be 2 careful
> **Elboghdady**: Right
> **UC**: So what are u looking for?
> **Elboghdady**: Make friend long term . . . U . . . Are u busy now . . . Hello
> **UC**: I dont think we are looking for the same thing. Sorry
> **Elboghdady**: Ok what u looking for . . . Tell me
> **UC**: I enjoy watching my girls have a good time . . .[3]
> **Elboghdady**: Wow i like that . . . I never watch . . . I'm interesting

---

[1] Each ellipsis that appears in quoted conversation is added by the court and represents the beginning of a separate text message.

[2] The text message evidence submitted before the court is a transcript of the UC's text message record. Accordingly, all text messages identified as "SMS Incoming" in the record are reprinted in this opinion as coming from "Elboghdady," and the messages identified in the record as "SMS Outgoing" appear in this opinion as coming from "UC."

[3] This ellipsis was included in the original text message.

**UC**: U dont watch? Do you prefer to participate?
**Elboghdady**: Sure
**UC**: I like to watch
**Elboghdady**: U like me . . . I don't enjoy with you
**UC**: Ur cute and all but I'm into girls. I just like to watch
**Elboghdady**: U watch no enjoy . . . Right
**UC**: Yes. I only watch
**Elboghdady**: U will enjoy with girls . . . Right . . . Ah okay . . . Just one time or we could be friends
**UC**: I would enjoy watching you with my girls. Would you enjoy that?
**Elboghdady**: Yes
**UC**: If it goes well it could be more than once. My girls would have to like it
**Elboghdady**: Sounds good . . . When u like meet up?

J.A. 364–65.

The UC then laid out the rules: "You have to be clean and disease free, no rough play or anal and you have to bring protection so you dont get them pregnant." J.A. 365. Elboghdady agreed. Then, for the first time, the UC revealed her fictitious daughters' ages: 11 and 13 years old. J.A. 366. Elboghdady asked the UC to "plz send me more pic," and the UC sent two photos that each showed a young girl. *Id.* By this time, it was nearly midnight and the two agreed to pick the conversation up in the morning. The next day, Elboghdady renewed his interest in the mother:

**Elboghdady**: Yesterday I said I want pic for u . . . And u go sleep . . .
**UC**: I sent you pics
**Elboghdady**: For u . . . Yea the girls . . . U sent
**UC**: Why u wanna see me? Lol
**Elboghdady**: Ok tell me when u like we will meet up? . . . Just make sure u are [winking eye emoji].

J.A. 367.

The UC sent a photo of herself but clarified that she was "not part of the deal." J.A. 368. Elboghdady responded, "I like to see your eyes . . . Right," and then the two began

4

arranging a face-to-face meet up. *Id.* They agreed to meet in Huntington, West Virginia, around 7:00 p.m. that same night. J.A. 369. The UC asked Elboghdady to bring gifts for her children, and he again reiterated his interest in the fictitious mother:

> **UC**: The girls appreciate gifts too
> **Elboghdady**: Haha really what the gifts
> **UC**: The 11 y/o likes stuffed animals and the 13y/o likes candy
> **Elboghdady**: I like see you enjoy with girls
> **UC**: I might need something for that to happen
> **Elboghdady**: Need what?
> **UC**: Well it wouldn't happen for free
> **Elboghdady**: Hey what mean
> **UC**: I wouldn't get involved with anything for free
> **Elboghdady**: Ah like hookup right
> **UC**: If you wanted to watch me with the girls I would need some money. I'm s single mom.
> **Elboghdady**: What . . . No I don't want see I'm okay with girls
> **UC**: Okay. . .that works[4]
> **Elboghdady**: U want me come or what . . . I'm not pay okay with that
> **UC**: Cam you at least bring them gifts? They feel more comfortable usually . . .
> **Elboghdady**: I will bring candy

J.A. 369–70.

Five minutes later, Elboghdady sent a text that demonstrated an explicit sexual interest in the fictitious mother. J.A. 370–71. When the UC told him she's "not into that for" herself, Elboghdady changed course:

> **Elboghdady**: Okay . . . Tell about girls what they like doing
> **UC**: What do you want to do with the girls so I can get them ready for you?
> **Elboghdady**: Sexy pants
> **UC**: Like workout pants?
> **Elboghdady**: How it workout . . . What? . . . Hello
> **UC**: Like what kind of sexy pants
> **Elboghdady**: Regular panties . . . What? . . . Okay

---

[4] This ellipsis was included in the original text message.

5

> **UC**: Oh sexy panties??
> **Elboghdady**: Yea . . . Tell about girls what they like doing

J.A. 371.

By this point, it was 5:00 p.m., and Elboghdady had left the Columbus, Ohio, area and was traveling to Huntington, West Virginia, for the face-to-face meeting. The two spoke on the phone for the first time while he was en route. In that call, he told the UC, "I'm speak English just a little bit. I'm not understand all the words," but that he would try to understand. J.A. 384. The phone call ended, and they continued to text:

> **Elboghdady**: Tell about girls what they like doing
> **UC**: Like
> **Elboghdady**: U tell me
> **UC**: Like sexually?
> **Elboghdady**: Yes . . . What?
> **UC**: As long as you are gental they like anything.
> . . .
> **Elboghdady**: The girls virgin
> **UC**: The 11 year old is. Do you still want her too?

J.A. 372.

Approximately five minutes later, Elboghdady called the UC again. He was confused about the numbers in her text messages and asked her to clarify:

> **Elboghdady**: [T]ell me what you say about 11, like 11, like 10, 15? What is number?
> **UC**: Um, the ages? My girls ages? Is that what you're asking? . . . Um, 11 and 13. Is that okay?
> **Elboghdady**: Eleven . . . yeah okay, but I'm talking about um, the playing about the girls. What you want, I do with the girls. I don't need or I don't want to make any mistake, you know that?
> . . .
> **UC**: Right. Well, see the 11, the 11-year-old is a virgin so she's never actually had sex before, but her sister has told her about it. So, she knows what happens, but I guess I just wanted to know, do you plan, do you plan

6

on doing something like that with the 11-year-old so I can kind of let her know what's going on?
**Elboghdady**: Uh huh. Okay
**UC**: Does that make sense?
**Elboghdady**: Yeah. Mm-hmm. How old are you?
. . .
**Elboghdady**: Okay. I want a like fun, good time, to spend with you. Good time. That's it.

J.A. 388–89.

When the UC asked if she should have the fictitious children "shower down there" to "get cleaned up," Elboghdady responded "Yeah, I'm clean. I'm taken shower, no worry." J.A. 390. The UC then asked:

**UC**: Okay, so what can I tell the youngest one who has never had sex before? That you would like to try to have sex with her, or do you want to try to have sex with her since she's a virgin?
**Elboghdady**: I don't know. She wants what?
**UC**: She's pretty laid back, she, she wouldn't, I don't think she would object.
**Elboghdady**: Mm-hmm. That's okay if, if she like that, I would try.
. . .
**UC**: Well, I'll just kind of, I'll, I'll let her know a little bit about what's going on so she's kind of prepared, but.
**Elboghdady**: Well, okay. Cool. What about you? (laughing)
**UC**: Me?
**Elboghdady**: Yeah, I like you.
**UC**: Too bad I'm a lesbian, right?
**Elboghdady**: Yeah, I know you a lesbian, it's okay. I play with you sometime.
**UC**: Yeah, I guess I, I've never really been into men. So.
**Elboghdady**: Yeah. Try. Why not? If you are feeling comfortable, why not . . .[5]
. . .
**Elboghdady**: Okay. It's okay, no problem, ah, we will see if you feeling comfortable with something.
**UC**: Okay. Alright. Well I think, I think meeting face to face will help and then if I feel comfortable and then, um, I'll take you to meet them.

---

[5] This ellipsis appears in the original phone transcript.

J.A. 390–91.

The two ended the phone call and returned to text messages. Elboghdady asked which girl was a virgin and sent photos of himself for the fictitious girls to see what he looks like. J.A. 372. He also asked the UC if he should send a photo of his private parts and asked for a photo of the "girl virgin." J.A. 373. Finally, he arrived at the meetup location.

The UC recorded their face-to-face meeting. They met at a restaurant, but later left to walk towards a house where the UC said the girls were. On the way, they had one final conversation about the 11-year-old:

> **UC**: So are you still wanting the youngest one even though she's never done anything before?
> **Elboghdady**: No, I just first time, I'm scared. [laughter]
> **UC**: Yeah [laughter] Do you, do you wanna try, or no?
> **Elboghdady**: I will try.
> . . .
> **UC**: I told her that you might want to and she said that she would try.
> **Elboghdady**: Okay
> **UC**: But if, if it hurts, well . . .[6]
> **Elboghdady**: Yeah, sure
> **UC**: We won't do that.

J.A. 395–96. Law enforcement appeared at the scene and arrested Elboghdady shortly afterwards.

### B.

---

[6] This ellipsis was included in the original transcript.

The Government charged Elboghdady with a single count of traveling with the intent to engage in criminal sexual activity, in violation of 18 U.S.C. § 2423(b) and (e). At trial, the government presented the timeline to the jury. Elboghdady's proposed jury instructions included an entrapment instruction. The government objected and argued that no evidence of government inducement existed, and an entrapment instruction was thus unwarranted. J.A. 161–62. The district court agreed. J.A. 171.

The jury subsequently convicted Elboghdady. At sentencing, the court accepted the Presentence Report (PSR) and adopted its recommendations. It included the application of an enhancement and cross reference applicable to crimes that involve a victim under the age of 12. The court calculated a total offense level of 36, which set the Guidelines range at 188–235 months' imprisonment, but it varied downward and ultimately sentenced Elboghdady to 120 months' imprisonment.

Elboghdady now appeals both his conviction and sentence, arguing that he was entitled to an entrapment instruction and that his sentence is unreasonable. We have jurisdiction to hear his claims pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and will address each argument in turn.

II.

9

"We review the district court's refusal to give an entrapment defense *de novo*." *United States v. Hsu*, 364 F.3d 192, 198 (4th Cir. 2004).[7]  Although entrapment is generally a jury question, a "court may find as a matter of law that no entrapment existed[] when there is no evidence in the record that . . . would show that the government's conduct created a substantial risk that the offense would be committed by a person other than one ready and willing to commit it." *United States v. Osborne*, 935 F.2d 32, 38 (4th Cir. 1991).

More than a scintilla of evidence of "(1) government inducement to commit a crime and (2) the lack of predisposition on the part of the defendant to engage in criminal conduct" must exist for a court to instruct the jury on entrapment. *Hsu*, 364 F.3d at 198. "[I]t is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play . . . ." *Hampton v. United States*, 425 U.S. 484, 489 (1976) (quoting *United States v. Russell*, 411 U.S. 423, 436 (1973)).

A.

---

[7] We acknowledge our circuit's ambiguity in deciding which standard of review to apply to an entrapment instruction challenge. *Compare Hsu*, 364 F.3d at 198 ("We review the district court's refusal to give an entrapment instruction *de novo*"), *with United States v. Smith*, 54 F.4th 755 (2022) ("[w]e now address the district court's refusal to give the jury an entrapment instruction. We review a district court's decision to give (or not give) a jury instruction for abuse of discretion").  We are bound by the "earliest-case-governs" rule, and therefore apply de novo review.  *See McMellon v. United States*, 387 F.3d 329, 333 (2004) ("we have made it clear that, as to conflicts between panel opinions, application of the basic rule that one panel cannot overrule another requires a panel to follow the earlier of the conflicting opinions.").

Here, the district court declined to give the entrapment defense because it found that "there wasn't anything in the government's approach that was excessive or overreaching." J.A. 171. Accordingly, we begin with government overreach. Government overreach, or inducement is defined as "solicitation *plus* some overreaching or improper conduct on the part of the government." *Hsu*, 364 F.3d at 200. To be entitled to the defense, Elboghdady must point to evidence of "government overreaching and conduct sufficiently excessive to implant a criminal design in the mind of an otherwise innocent party." *Id.* at 198. He claims that the UC's decision to continue the conversation despite his repeated interest in the fictitious mother and the language barrier that permeated their conversations provide proof of overreach. We disagree.

Elboghdady points to the UC repeatedly offering him the fictious young girls as the qualifying conduct. But repeated suggestions from law enforcement do not give rise to government overreach. *See, e.g.*, *United States v. Velasquez*, 802 F.2d 104, 106 (4th Cir. 1986) (holding that the defendant failed to show evidence of inducement where defendant's charge, based on acquiring cocaine, only occurred after law enforcement called the defendants *over thirty times* to "suggest" that defendant acquire cocaine). His sustained interest in the fictitious mother also fails to rise to the level of overreach because it does not concern government action. Each time Elboghdady expressed interest in the mother, the UC declined the advance and refocused the conversation on the two young girls. She did so without persuading or otherwise swaying Elboghdady to act, so the defense is unwarranted.

11

Although our precedent compels an affirmance, we feel impelled to speak to the nature of the evidence before the court. A plain reading of Elboghdady's interaction with the UC exposes his confusion. The confusion affects every phase of the timeline and was obvious enough for the UC to recognize. We cannot say that she "overreached" here, under the definition adopted in our entrapment jurisprudence, but the UC's pursuit to make sure "somebody is not out there preying on children when [she] possibly could have done something about it," should not make clear evidence of someone's confusion obsolete. J.A. 135. Of course, that is not to suggest that only people who speak perfect English can commit crimes. But here, where Elboghdady's focus before he travelled to the meeting was on the fictious mother and all comments made about children were either (1) later revealed in the timeline as a point of his confusion and/or (2) never initiated by him but offered in response to a direct question from the UC, the belief that Elboghdady was "preying on children" should have been less tenable to a seasoned officer. For example, the district court recognized that "there was certainly evidence that the defendant had a significant language barrier." J.A. 312. It found a number of instances in the timeline "represent[ed] ambiguous statements," and that "there was pretty clear evidence that the defendant did pursue the mother persistently." *Id. See also* J.A. 388–89 (Elboghdady, while "travel[ing] in interstate commerce," demonstrating his lack of understanding for what the number "11" meant in the timeline communication) (quoting J.A. 12 (indictment)).

The entrapment standard does not act as a free pass for the government to ignore the context of the interactions they engage in during undercover operations. As the district

12

court deduced, "there is not evidence here that Mr. Elboghdady was a predator, was on the prowl when he saw this [ad] and decided here was his chance to go have sex with a couple of minors." J.A. 315. We caution law enforcement to remember the purpose of its conduct when operating undercover operations: "The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime." *Sherman v. United States*, 356 U.S. 369, 372 (1958).

## B.

Elboghdady also argues that the district court independently erred because it only considered the inducement prong in its denial of the entrapment instruction. He contends that because predisposition is "the principal element in the defense of entrapment," the court was required to decide that issue. *Mathews v. United States*, 485 U.S. 58, 63 (1988) (quoting *Russell*, 411 U.S. at 433) (internal quotation marks omitted). However, *both* elements are required to unlock the instruction. A deficient showing on either prong ends the analysis. The court properly concluded that no evidence of inducement exists, therefore, we find no error in the district court's decision to deny the instruction on that basis.

## III.

## A.

Next, Elboghdady challenges the reasonableness of his sentence. "Reasonableness review has procedural and substantive components." *United States v. Hargrove*, 701 F.3d 156, 160 (4th Cir. 2012) (quoting *United States v. Mendoza-Mendoza*, 597 F.3d 212, 216

(4th Cir. 2010)).  We review both for an abuse of discretion.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  "In applying the abuse-of-discretion standard, we review the district court's factual conclusions for clear error . . . and its legal conclusions *de novo*."  *In re Grand Jury 2021 Subpoenas*, 87 F.4th 229, 250 (4th Cir. 2023).

Even when an appellant only challenges the substantive reasonableness of a criminal sentence, as Elboghdady does here, the Supreme Court instructs us to first review procedural reasonableness.  *United States v. Provance*, 944 F.3d 213, 218 (4th Cir. 2019) ("The Supreme Court has mandated that in reviewing any sentence, appellate courts '*must first ensure* that the district court committed no significant procedural error.' ") (citing *Gall*, 552 U.S. at 51).

### B.

The dissent would not  "consider [the] procedural reasonableness issue," or any argument Elboghdady previously dismissed.  Diss. Op. at 24.  True, Elboghdady previously acknowledged that his Guidelines range calculation was technically appropriate.  *Id*.  But circuit precedent prevents us from agreeing with the dissent.  In *Provance*, this court determined that the Supreme Court mandates appellate courts to "*first ensure*" no procedural error exists.  *Provance*, 944 F.3d at 218 (internal quotation marks omitted).  There, the Government "[i]nexplicably . . . [did] not argue the sentence . . . [was] procedurally unreasonable. Indeed, the Government assert[ed] that the sentence [was], in fact, procedurally reasonable."  *Id*.  Still, we heeded Supreme Court instruction and vacated the sentence as procedurally unreasonable.  *Id.* at 219.

14

According to the dissent, *Gall* does not "support[] the far-reaching rule established by *Provance* . . . that we scour the record for any procedural unreasonableness, even where procedural reasonableness has not been challenged." Diss. Op. at 26. In the dissent's view, *Gall*'s command to "first ensure that the district court committed no significant procedural error" is limited to cases where both procedural and substantive sentencing errors are alleged. *Gall*, 552 U.S. at 51. We disagree. The *Gall* Court's discussion of sentencing and sentence review was not limited to the circumstance of the case that was before the Court. To the contrary, the relevant section of the opinion provides generally applicable guidance on how courts should approach sentencing. *See, e.g.*, *Gall*, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistence, the Guidelines should be the starting point and the initial benchmark." (internal citation omitted)); *id.* at 49–50 ("The Guidelines are not the only consideration, however . . . . In [considering the § 3553(a) factors, the district court] may not presume that the Guidelines range is reasonable."); *id.* at 50 (the district court "must make an individualized assessment based on the facts presented"); *id.* at 51 ("Regardless of whether the sentence imposed is inside or outside the Guidelines range, the appellate court must review the sentence under an abuse-of-discretion standard. It must first ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range . . . ."). Thus, in our view, *Gall* supports the

15

conclusion that an appellate court's first responsibility in a sentencing challenge is to review the procedural reasonableness of the challenged sentence.[8]

## C.

"A district court commits procedural error by failing to calculate (or improperly calculating) the Guidelines range." *United States v. Smith*, 75 F.4th 459, 464 (4th Cir. 2023) (internal quotation marks omitted). The application of sentencing enhancements is a legal conclusion that we review de novo. *United States v. Henderson*, 88 F.4th 534, 536 (4th Cir. 2023). "While we acknowledge . . . that contentions not in the argument section of the opening brief are ordinarily abandoned, we nonetheless conclude that we are

---

[8] The dissent also argues that "[i]nstead of following *Provance*, we should follow *Louthian* and *Wallace*." Diss. Op. at 28; *see United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014) (stating only that the defendant "ma[de] no assertion that his forty-eight-month sentence was tainted by procedural flaws . . ." before moving on to conclude that the sentence was substantively reasonable); *United States v. Wallace*, 515 F.3d 327, 333–34 (4th Cir. 2008) ("Since [the defendant] does not point out any procedural improprieties in his sentence, we limit out review to . . . substantive reasonableness."). The dissent believes that the "earliest-case-governs" rule applies in this instance, and because *Louthian* and *Wallace* predate *Provance*, we are limited to consideration of Elboghdady's substantive sentencing challenge. Diss. Op. at 28. We disagree for two reasons. First, *Provance* is the first Fourth Circuit case to consider whether *Gall* requires procedural review in all sentencing challenges, and the panel held that it does. Both cases the dissent relies on stop short of analyzing the issue. Because neither *Louthian* nor *Wallace* held that we are limited to the challenges the defendant brings, the earliest-case-rule is inapplicable here. Second, even if we accept that dicta can be precedential on the question, *Pauley*, a post-*Gall* case that predates the cases the dissent cites, would control. *See United States v. Pauley*, 511 F.3d 468, 474 (4th Cir. 2007) (concluding that "there are no procedural errors" in the sentence despite "[t]he parties agree[ing] that the district court correctly calculated the Guidelines range"); *see also United States v. Go*, 517 F.3d 216, 218 (4th Cir. 2008) (stating "[w]e first ensure that the district court committed no procedural error" and "[a]ssuming that the district court's sentencing decision is procedurally sound" we then address substantive arguments).

16

required to analyze procedural reasonableness before turning to substantive reasonableness." *Provance*, 944 F.3d at 218.

The district court calculated a total offense level of 36. J.A. 307. Its calculation included an eight-level enhancement under U.S.S.G.§ 2G1.3(B)(5). *See* U.S.S.G. § 2G1.3(b)(5) (if "the offense involved a minor who had not attained the age of 12 years, increase by 8 levels."); J.A. 306. The Guidelines also provided for the application of a cross reference. J.A. 306–07. Under that cross reference, § 2A3.1(b)(2), if "the victim had not attained the age of twelve years," the court must "increase [the base offense level] by 4 levels." *See also* U.S.S.G. § 2G1.3(c)(3) (stating that "[i]f the offense involved interstate travel with intent to engage in a sexual act with a minor who had not attained the age of 12 years . . . § 2A3.1 shall apply"). With the base offense level calculated at 36, the Guidelines range was set to 188–235 months' imprisonment.[9] The district court varied downward and sentenced Elboghdady to 120 months' imprisonment.

For the application of the enhancement and cross reference to be procedurally reasonable, the district court must have believed by a preponderance of the evidence that "the offense involved a minor who had not attained the age of 12 years," and that Elboghdady "travel[ed] with intent to engage in a sexual act with a minor who had not attained the age of 12 years." S.A. 406; *see also United States v. Grubbs*, 585 F.3d 793,

---

[9] The court also added a two-level increase for use of a computer. The computer enhancement is not at issue in this case.

803 (4th Cir. 2009) ("Preponderance of the evidence is the appropriate standard of proof for sentencing purposes."). The court's factual findings reveal the opposite.

At sentencing, the court stated that it "followed the evidence [presented at trial] pretty carefully," J.A. 311–12, and that it thought "the evidence supported the jury's findings that [Elboghdady] was . . . interested in having a sexual relationship with the two minors." J.A. 312. However, in this instance, evidence supporting the conviction "with the two" fictitious victims, on its own, cannot justify applying the enhancement. *Id.* Because the government chose to charge a single-count indictment, evidence as to *either* of the fictitious victims can satisfy the conviction. The entirety of the indictment states that:

> On or about February 28, 2020, [Elboghdady] did travel in interstate commerce, that is, from at or near Columbus, Ohio, to at or near Huntington, Cabell County, West Virginia, within the Southern District of West Virginia, for the purpose of engaging in any illicit sexual conduct, as defined in [18 U.S.C. § 2423(f)], with another person, and attempted to do so. In violation of [18 U.S.C §§ 2423(b) and (e)].

J.A. 12.

Section 2423 prohibits illicit sexual conduct, defined as "a sexual act . . . with a person under 18 years of age." 18 U.S.C. § 2423(g)(1). Sections (b) and (e) make it a crime to travel with intent to engage in illicit sexual conduct, and to attempt or conspire to the do the same violates section (f). The charging instrument does not itself necessitate the involvement of a victim under 12 years old. And, again, evidence at trial revealed that the two fictitious victims, one of whom was above the age of 12, were "generally mentioned one after the other, both by th[eir] ages." J.A. 313.

18

The enhancement and the cross reference, however, require a specific finding that evidence existed to demonstrate that Elboghdady traveled with the intent to engage in contact particularly with the 11-year-old. The dissent argues that the underlying record supports a finding that Elboghdady intended to engage in illicit conduct with the 11-year-old. Diss. Op. at 32–34. But the district court "followed the evidence pretty carefully," and came to the opposite conclusion. J.A. 311–12.

The district court's findings demonstrate that it believed the evidence fell short of the necessary standard. Instead, the court found that it did not "believe the evidence was so strong as to the 11-year-old's being the target of the defendant's travel." J.A. 314. The court stated that:

> [T]hroughout the trial, [the court] noticed and attached some significance to the fact that the[] two girls were generally mentioned one after the other, both by [their] ages. There wasn't anything except maybe a very limited text exchange that dealt with the 11-year-old as opposed to the 13-year-old. And so as a result, . . . we don't have evidence of exactly what he would have carried out had he not been arrested. And so I think to apply the cross reference and the greater offense levels without some counterbalance is unfair.

*Id.* at 313. The district court's findings are not clearly erroneous, so we defer to its interpretation of the facts. *Gall*, 552 U.S. at 41 (stating that courts are bound by the "deferential abuse-of-discretion standard" in sentencing challenges). The court analyzed the facts presented and found insufficient evidence of Elboghdady's intent to engage with the 11-year-old. Despite finding that the evidence it followed "pretty carefully" was not "so strong as to the 11-year-old's being the target of the defendant's travel," J.A. 314, the district court nevertheless applied the enhancements, which require a preponderance of

19

evidence finding that Elboghdady intended to engage with the 11-year-old. Its findings are contrary to the showing necessary to apply the enhancements. Further, the Statement of Reasons supporting the sentence is devoid of any reference particular to the 11-year-old. S.A. 425–28.

The district court found the evidence was insufficient to prove Elboghdady's interest in the fictitious 11-year-old. In light of the court's factual findings, which we must defer to at this stage, the court's application of the enhancement and cross-reference constitute procedural error.

Though the district court applied a significant downward variance, the variance cannot reduce the oversight to the level of harmless error. Without the enhancement and cross reference, Elboghdady's adjusted base offense level would have been 26, and his Guidelines range would have been 63–78 months' imprisonment. A 120-month prison term is a substantial upward variance from Elboghdady's applicable Guidelines range. The dissent concludes that the district court's "decision to impose a sentence more lenient than the one advised by the Guidelines was not a failure to make a finding necessary to apply the cross reference or enhancement in the first place." Diss. Op. at 31. We agree; such a decision would be "an exercise of a district court's broad sentencing discretion." *Id.* But that is not what happened here. Our holding is grounded in the principle that district courts may not improperly calculate a Guidelines range. The district court found that there was no "evidence of exactly what [Elboghdady] would have carried out." J.A. 313. It was therefore improper to apply sentencing enhancements that require evidence of

20

Elboghdady's intent to engage with the 11-year-old. The decision to impose a lenient sentence does not correct that error.

Elboghdady's sentence is therefore vacated and remanded with instructions for the district court to resentence him without imposition of sentencing enhancements that require evidence of Elboghdady's intent to engage with the fictitious 11-year-old minor.[10]

IV.

The district court abused its discretion when it applied enhancements not supported by the record. The resulting improper Guidelines calculation amounts to procedural error. "The evidence in the record does not clearly support application of the enhancement[s], and therefore, we must vacate and remand for resentencing." *United States v.* Mitchell, 78 F.4th 661, 671 (4th Cir. 2023). Therefore, Elboghdady's conviction is affirmed, and his sentence is vacated and remanded to the district court for resentencing without the application of the enhancement and cross reference found in U.S.S.G. § 2G1.3(b)(5) and (c)(3).

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED WITH INSTRUCIONS*

---

[10] Having found an abuse of discretion in the district court's sentencing procedure, we decline to address Elboghdady's substantive sentencing arguments.

QUATTLEBAUM, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that the district court properly denied Makel Elboghdady's request for an entrapment instruction to the jury. But I write separately on the entrapment issue to respond to the majority's dicta about "the nature of the evidence before the court." Maj. Op. at 12.

More importantly, I write to explain my disagreement with the majority's conclusion that the district court misapplied a sentencing cross reference and enhancement for sex offenses involving particularly young victims. The majority makes four errors—it rests on an argument that Elboghdady declined to make; it applies an incorrect standard of review; it paints over the district court's finding that both the cross reference and the enhancement applied; and it ignores abundant evidence in the record supporting that finding. So, I concur in part and dissent in part.


I.

Entrapment first. The majority rightfully concludes that the record does not support an entrapment instruction. But it then questions our binding precedent which, it acknowledges, "compels an affirmance." Maj. Op. at 12. The majority seems to believe that even if the undercover officer did not "overreach," she took advantage of Elboghdady's "confusion." *Id.* According to the majority, Elboghdady's "confusion affects every phase of the timeline and was obvious enough for the [undercover officer] to recognize." *Id*. The majority then adds that "Elboghdady's focus before he travelled to the meeting was on the fictious mother and all comments made about children were either (1)

later revealed in the timeline as a point of his confusion and/or (2) never initiated by him but offered in response to a direct question from the [undercover officer]." *Id.*.

The majority's reading of the record is too generous to Elboghdady. To be sure, Elboghdady expressed a sexual interest in the fictitious mother throughout the episode. But as the majority itself acknowledges, time and time again, the undercover officer made clear that she was "not part of the deal" and confirmed that the arrangement was all about the fictitious children. J.A. 353–54. Far from capitalizing on any confusion, the officer consistently cleared it up. Elboghdady's persistent pursuit of the fictitious mother does not make her refutations any less firm, nor does it erase Elboghdady's demonstrated interest in the underage girls. Without leading Elboghdady to think that sex with her was a possibility, the officer propositioned Elboghdady with images of the young girls. Elboghdady responded by traveling across state lines with plans to have sex with the young girls. That conduct is criminal. And the fact that Elboghdady held out hope that sex with minors might lead to sex with their mother does not lessen it.

## II.

Sentencing next. Although Elboghdady challenges only the substantive reasonableness of his sentence, the majority vacates Elboghdady's sentence as procedurally unreasonable. To do so, it conducts its own review of the record. It then finds insufficient support for a cross reference that provides a higher base offense level for offenses involving "interstate travel with intent to engage in a sexual act with a minor who had not attained the age of 12 years" and an enhancement that adds four more levels for

23

offenses where "the victim had not attained the age of twelve years." U.S.S.G. §§ 2G1.3(c)(3) and 2A3.1(b)(2).[1] The majority bases these findings on the following remarks the district court made about the amount of evidence of Elboghdady's specific interest in the 11-year-old girl:

> [T]hroughout the trial, [the court] noticed and attached some significance to the fact that th[e] two girls were generally mentioned one after the other, both by [their] ages. There wasn't anything except maybe a very limited text exchange that dealt with the 11-year-old as opposed to the 13-year-old. And so as a result, since this was an offense that was completed when the defendant traveled here with the intention, we don't have evidence of exactly what he would have carried out had he not been arrested. And so I think to apply the cross reference and the greater offense levels without some counterbalance is unfair.

J.A. 313.

Relying on that language, the majority concludes that the district court, despite applying the enhancements for intent to have sex with a fictitious 11-year-old girl, actually found the opposite—that the evidence failed to show Elboghdady's interest in the fictitious 11-year-old girl. Maj. Op. at 19–20 . For the following reasons, I cannot agree.

A.

First, we should not even consider this procedural reasonableness issue. In vacating the sentence, the majority crafts an argument that Elboghdady himself disclaimed. At the sentencing hearing and on appeal, Elboghdady did not object to using the cross reference

---

[1] Had the cross reference not applied or had it resulted in a lower total offense level, the district court would have applied, instead of the cross reference and four-level enhancement, an eight-level enhancement to the original base offense level for offenses that "involved a minor who had not attained the age of 12 years." U.S.S.G. § 2G1.3(b)(5).

and enhancement to calculate his Guidelines range. To the contrary, he acknowledged that the Guidelines range calculation, including both the cross reference and enhancement, was "technically appropriate." Op. Br. at 22. Instead, Elboghdady argued that his circumstances made the application of the enhancements draconian, warranting a downward variance. We should not vacate a sentence on a ground that Elboghdady failed to advance both before and now. *See United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014); *United States v. Wallace*, 515 F.3d 327, 333–34 (4th Cir. 2008).

Rejecting that view, the majority concludes *United States v. Provance*, 944 F.3d 213, 218 (4th Cir. 2019) requires us to review the sentence's procedural reasonableness, even when no party challenged the procedural reasonableness of the sentence at the sentencing hearing or on appeal. To be fair, *Provance* decision supports that approach. *Provance*, 944 F.3d at 218. There, the government challenged only the substantive reasonableness—not the procedural reasonableness—of the sentence. *Id.* at 217. Accordingly, the defendant asked us to hold that the government had waived any procedural unreasonableness argument. *Id.* We declined to do so. *Id.* at 218. In short order, we explained that "[t]he Supreme Court has mandated that in reviewing any sentence, appellate courts '*must first ensure* that the district court committed no significant procedural error.'" *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007) (emphasis added)). We also noted that "our own case law makes clear, '[i]f, and only if, we find the sentence procedurally reasonable can we consider the substantive reasonableness of the sentence under an abuse-of-discretion standard.'" *Id.* (quoting *United States v. Carter*, 564 F.3d 325, 328 (4th Cir. 2009)). Of course, "our own case law"—*Carter*—cites *Gall* for that

25

statement. *See Carter*, 564 F.3d at 328 ("We must first 'ensure that the district court committed no significant procedural error.' If, and only if, we find the sentence procedurally reasonable can we 'consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard.'" (quoting *Gall*, 552 U.S. at 51)).

But in my view, we should not follow *Provance*. As discussed, *Provance* purports to rely on *Gall* and *Carter*. Yet neither supports the far-reaching rule established by *Provance* and the majority's decision—that we scour the record for any procedural unreasonableness, even where procedural reasonableness has not been challenged. Unlike this case, *Gall* involved a claim of not just substantive reasonableness but also procedural unreasonableness. *See* 552 U.S. at 45; *see also United States v. Gall*, 446 F.3d 884, 888 (8th Cir. 2006). In that situation, the Supreme Court held that procedural reasonableness should be considered first. *Gall*, 552 U.S. at 51. That of course makes sense because the outcome of that analysis will bear heavily on the substantive reasonableness issue. *Id.* But the Court nowhere suggested courts facing only substantive unreasonableness challenges must conduct an *Anders*[2]-like review for procedural issues, whether raised or abandoned.

The same with *Carter*. There, one year after *Gall*, we reviewed a sentence that the government challenged as *both* procedurally and substantively unreasonable. *See Carter*, 564 F.3d at 326. Citing *Gall*, we began by assessing the sentence's procedural reasonableness. *Id.* at 328. We concluded that the sentence was procedurally unreasonable. *Id.* at 330. Despite the government's lingering challenge to substantive reasonableness, we

---

[2] *Anders v. California*, 386 U.S. 738, 744–45 (1976).

26

explained that "[h]aving found the sentence procedurally unreasonable, . . . we cannot review the sentence for substantive reasonableness." *Id.* at 330 n.4. Because *Carter* involves essentially the same procedural situation as *Gall*, it likewise does not support the conclusion reached in *Provance* or by the majority today.

Not only does *Provance* lack precedential support, but it also conflicts with our own post-*Gall* precedent. In *Louthian*, the defendant challenged his below-Guidelines sentence as excessive in light of his age, poor health and lack of criminal history. In other words, he challenged the substantive reasonableness of his sentence. Assessing this substantive reasonableness challenge, we first noted that "[w]e review a court's sentencing decisions for abuse of discretion only." *Louthian*, 756 F.3d at 306 (quoting *Gall*, 552 U.S. at 49–51). We recognized that "[a]ny sentence that is within or below a properly calculated Guidelines sentence is presumptively reasonable." *Id.* (quoting *United Sates v. Abu Ali*, 528 F.3d 210, 261 (4th Cir. 2008)). That "presumption can only be rebutted by showing that the sentence is unreasonable when measured against the 18 U.S.C. § 3553(a) factors." *Id.* (citing *United States v. Montes-Pineda*, 445 F.3d 375, 379 (4th Cir. 2006)). We went on to explain:

> [The defendant] makes no assertion that his forty-eight-month sentence was tainted by procedural flaws, such as errors in calculating the Guidelines range, erroneously treating the Guidelines as mandatory, failing to properly consider the § 3553(a) factors, predicating the sentence on clearly erroneous facts, or failing to adequately explain the sentence. *Gall*, 552 U.S. at 51. Meanwhile, we cannot conclude that his sentence was substantively unreasonable. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216 (4th Cir. 2010). We observe that, although the court denied [the defendant's] request for a departure on account of age, health, and criminal history, it varied downward for those reasons, imposing an aggregate sentence (48 months) that is less than half of the low end of his Guideline range (121 months). [The defendant's] sentence therefore cannot be deemed unreasonable.

*Louthian*, 756 F.3d at 306. So, we did not read *Gall* to require our consideration of a sentence's procedural reasonableness when only the substantive reasonableness is challenged. What's more, we had already espoused this understanding of our post-*Gall* reasonableness analysis in *Wallace*. There, we explained that "[s]ince [the defendant] does not point out any procedural improprieties in his sentence, we limit our review to the substantive reasonableness of [his] sentence under an abuse of discretion standard." 515 F.3d at 333—34. (citing *Gall*). By requiring the court to consider procedural reasonableness before substantive reasonableness even where procedural reasonableness is not challenged—a completely different approach from *Louthian* and *Wallace*—*Provance* irreconcilably conflicts with those earlier decisions.

Instead of following *Provance*, we should follow *Louthian* and *Wallace*, both of which teach that we do not address procedural unreasonableness issues not raised below or on appeal. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) ("When published panel opinions are in direct conflict on a given issue, the earliest opinion controls, unless the prior opinion has been overruled by an intervening opinion from this court sitting en banc or the Supreme Court."). That comports with our requirement that the oldest panel opinions control. It also avoids turning our well-settled principles of waiver, forfeiture, abandonment and party-presentation upside down. *See Puckett v. United States*, 556 U.S. 129, 134 (2009) ("If a litigant believes that an error has occurred (to his detriment) during a federal judicial proceeding, he must object in order to preserve the issue. If he fails to do so in a timely manner, his claim for relief from the error is forfeited."); *Id.* ("If

28

an error is not properly preserved, appellate-court authority to remedy the error . . . is strictly circumscribed."); *United States v. Robinson*, 744 F.3d 293, 298 (4th Cir. 2014) ("Courts may review a forfeited claim for plain error. But when a claim is waived, it is not reviewable on appeal, even for plain error." (internal citations omitted)). The majority's contrary approach means those principles have no role when a defendant chooses to challenge only substantive reasonableness. That cannot be right.

Not surprisingly, our approach puts us on an island away from the vast majority of our sister circuits.[3] We should escape this island quickly and follow the approach *Louthian* and *Wallace* require.

---

[3] *See, e.g.*, *United States v. King*, 741 F.3d 305, 308 (1st Cir. 2014) (considering only substantive reasonableness where "the defendant has not preserved any claim of procedural error" and "his lone assignment of error reduces to a plaint that the district court's downward variance did not go far enough, resulting in a sentence that is substantively unreasonable"); *United States v. Thavaraja*, 740 F.3d 253, 258–59 (2d Cir. 2014) (considering only substantive reasonableness where "the Government challenges only the substantive reasonableness of Thavaraja's sentence"); *United States v. Hudgens*, 4 F.4th 352, 357 (5th Cir. 2021) ("Although Hudgens's counsel objected to his sentence on both procedural and substantive grounds, Hudgens addresses only the substantive reasonableness of his sentence on appeal. Therefore, we will confine our analysis to whether the district court's sentence was substantively reasonable."); *United States v. Tristan-Madrigal*, 601 F.3d 629, 632 (6th Cir. 2010) ("Because Tristan-Madrigal does not challenge the procedural reasonableness of his sentence, and explicitly disclaimed such a challenge at oral argument, this court need only consider the substantive reasonableness of the sentence imposed under an abuse-of-discretion standard." (internal quotations and citations omitted); *United States v. O'Connor*, 567 F.3d 395, 397 (8th Cir. 2009) ("Because O'Connor does not argue in his briefs that the district court committed any procedural error, we bypass the first part of our review and move directly to the substantive reasonableness of his sentence."); *United States v. Stewart*, 761 F.3d 993, 999 (9th Cir. 2014) (declining to consider procedural reasonableness where "neither party challenges the district court's sentencing procedure"); *United States v. Ware*, 93 F.4th 1175, 1180 (10th Cir. 2024) (declining to consider procedural reasonableness where defendant only challenged substantive reasonableness); *United States v. Hayes*, 762 F.3d 1300, 1310 (11th Cir. 2014) (Continued)

B.

Second, in reaching to address an issue not raised by the parties, the majority incorrectly applies an abuse-of-discretion standard of review to the district court's cross reference and enhancement application. *See* Maj. Op at 13–14. "In each case, we must first determine if the appellant lodged his objection to the adequacy of the district court's sentencing procedure for the first time on appeal. If so, we can review only pursuant to the rigorous plain-error standard. If, however, the appellant preserved his appellate objection by articulating it first in the district court, we review for abuse of discretion-reversing if we find error unless we can conclude that it was harmless." *United States v. Lynn*, 592 F.3d 572, 579 (4th Cir. 2010); *see also United States v. Lester*, 985 F.3d 377, 384 (4th Cir. 2021). If we review procedural challenges that are raised for the first time on appeal for plain error, why would we apply abuse-of-discretion review to a procedural challenge that Elboghdady did not make at the sentencing hearing and has not raised on appeal?

Under plain error review, "the appealing party must show that an error (1) was made, (2) is plain (i.e., clear or obvious), and (3) affects substantial rights." *Lynn*, 592 F.3d at 577. Even where an appellant makes this showing, we may exercise our discretion only to

("We recognize that, normally, we ensure that there is no procedural error before addressing a claim of substantive unreasonableness, but we will not reach out to address a possible procedural error when neither the defendant nor the government have complained about it." (internal citation omitted)). *Cf. United States v. Moore*, 784 F.3d 398, 402 (7th Cir. 2015) (considering only substantive reasonableness of sentence where defendant did "not claim any procedural error"). *But see United States v. Khatallah*, 41 F.4th 608, 644–48 (D.C. Cir. 2022) (reviewing district court's sentencing procedure despite recognizing that defendant did not challenge procedural reasonableness).

correct an error that "seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* (internal quotations omitted). Since Elboghdady did not challenge cross reference and enhancement application, any review of that issue—which I maintain we should not—should be only for plain error.

C.

Third, the majority misconstrues the record. The district court stated there was limited evidence of Elboghdady's specific interest in the 11-year-old alone. After accepting the Guidelines range calculated in the presentence report (which applied the cross reference and enhancement), the court varied downward because it decided that applying the cross reference and enhancement resulted in too high a sentence when considering that most of the evidence of Elboghdady's interest in the 11-year-old also demonstrated his interest in the 13-year-old. The decision to impose a sentence more lenient than the one advised by the Guidelines was not a failure to make a finding necessary to apply the cross reference or enhancement in the first place. Rather, it was an appropriate exercise of the district court's broad sentencing discretion to impose a sentence that reflects all of the circumstances and the many factors listed in § 3553(a).

In reaching the opposite conclusion, the majority converts the district court's rationale for varying downward into a supposed confession by the district court that it lacked evidence to support the cross reference or enhancement. To support its wrong turn, the majority relies on the district court's statement that it did not "have evidence of exactly what [Elboghdady] would have carried out . . . ." Maj. Op. at 19, 20–21 (quoting J.A. 313). But whatever that snippet might suggest in isolation, context belies the majority's

31

conclusion. Consider first the full sentence containing that language—"And so as a result, since this was an offense that was completed when the defendant traveled here with the intention, we don't have evidence of exactly what he would have carried out had he not been arrested." J.A. 313. Also, just a few breaths before, the district court stated:

> I'm not going to criticize the government for the timing of their intervention by arrest here. Obviously the defendant met with the mother, and they were in his mind proceeding to meet with the minors when they were arrested. No one, and certainly I wouldn't claim to, can say with certainty what would have happened if these were real people and real minors, and he actually got into a room with them.

J.A. 312. With this context, it becomes clear that the district court was merely saying that since the meeting involved a fictitious mother and children, we have no way to know exactly what would have happened if real people were involved. There is nothing earthshattering about that. With any attempt offense, we never know if the defendant might have had a change of heart. Despite that possibility, the district court in fact applied the cross reference and enhancement. And it never found there was insufficient evidence of Elboghdady's interest in the fictitious 11-year-old girl. Not even Elboghdady says that.

## D.

Last, the underlying record supports the district court's application of the cross reference and enhancement. There is ample evidence that Elboghdady planned to engage in sexual acts with the fictitious 11-year-old. The night Elboghdady began communicating with the undercover officer, the officer said, "You have to be clean and disease free, no rough play or anal and you have to bring protection so you dont get them pregnant." J.A. 349. After Elboghdady joked about "never buy[ing] condom[s]," the officer followed up,

32

"Better to be safe. They are 11 and 13 but can still get pregnant and I do not want to be a grandma." J.A. 349–50. Elboghdady agreed to those ground rules and asked for more pictures or a video.

The next day, Elboghdady continued to communicate with the undercover officer, specifically about the 11-year-old girl. Elboghdady called the officer as he drove from Ohio to meet her and her supposed girls in Huntington, West Virgina. During that call, the officer stated that the 11-year-old girl was a virgin but knew about sex from her sister. She then asked if Elboghdady "plan[ned] on doing something like that with the 11-year-old so I can kind of let her know what's going on?" J.A. 389; J.A. 429. He responded, "Uh huh. Okay." J.A. 389; J.A. 429. Later in that same conversation, the officer asked Elboghdady if she should tell the 11-year-old girl that he "would like to try to have sex with her, or do you not want to try to have sex with her since she's a virgin?" J.A. 390; J.A. 429. Elboghdady responded, "I don't know. She wants what?" J.A. 390; J.A. 429. After being told that the girl was "pretty laid back" and probably would not object, he said, "Mm-hmm. That's okay if, if she like that, I would try." J.A. 390; J.A. 429. So Elboghdady assented to have sex specifically with the 11-year-old girl.

After the call, Elboghdady resumed texting. He began specifically by asking, "Which girl virgin." J.A. 361. The undercover officer again confirmed that the 11-year-old was a virgin. After messaging about food, Elboghdady demanded, "Send me pic girl virgin." J.A. 363. Importantly, he did not request a picture of the fictitious mother or older sister, just a picture of the 11-year-old. The undercover officer responded with a photo.

33

When they met in Huntington, the officer asked Elboghdady, "So are you still wanting the youngest one even though she's never done anything before?" J.A. 395; J.A. 430. He replied, "No, I just first time, I'm scared," and then laughed. J.A. 395; J.A. 430. When the undercover officer followed up, Elboghdady confirmed his intent to have sex with the 11-year-old. "I will try," he said. J.A. 395; J.A. 430.

This record contains more than enough evidence to sustain the district court's application of the age-related cross reference and enhancement. It did not err in applying the enhancement. It certainly did not clearly and obviously err.

E.

For the reasons stated above, I would affirm the sentence.